ALBANY.

Vandenheuvel
v
United Insur.
Company.

John Vandenheuvel *against* the United Insurance
Company.

IN error on a judgment of the supreme court, in an action on a policy of insurance on the freight of " the good American ship called the *Astrea*, at and from *New-York*, to *Corunna*," the freight valued at ten thousand dollars, at a premium of fifteen per cent.

In an action on a policy of insurance, the sentence of a foreign court of admiralty, is not conclusive on the character of the property.

E e

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

At the trial in the court below, the jury brought in a special verdict stating, among other things,

That the policy was underwritten by the defendants in error, in consequence of a written application made to them, by the plaintiff in error, in the words and figures following, to wit.:

"*New-York*, 14*th November*, 1798.

"*Gentlemen*—What will be the premium on the ship, freight and cargo of the *Astrea*, captain *Price*, consisting in *mahogany*, *tobacco*, *staves*, *dye-wood and sugar*, at and from *New-York* to *Corunna*, to sail in eight days, property of the undersigned.

"J. C. VANDENHEUVEL."

That the ship in the course of her voyage, was captured by a British frigate, and carried into *Gibraltar*, where she, together with her cargo, were libelled in the court of vice-admiralty, and condemned as lawful prize to the captors, " as belonging at the time of her capture to *Spain*, or to persons being subjects of the king of *Spain*, or inhabiting within the territories of the king of *Spain*, enemies of the king of *Great-Britain*." That the freight, by reason of the capture and condemnation aforesaid, was totally lost to the plaintiff in error, who duly abandoned the same to the defendants in error, exhibiting to them at the same time, due proof of loss and interest; that the freight was really the property of the plaintiff in error, and the ship and cargo were also his property, unless in judgment of law the plaintiff in error is concluded by the said sentence of condemnation ; that the ship, at the time of the capture, was registered as an American vessel, and had all the papers which an American vessel usually has ; that

the plaintiff in error was born a subject of the *United*
*Netherlands*, and continued such until the 3d *June*,
1793, when he became a naturalized citizen of the
*United States*, according to law ; and the defendants
in error, at the time of underwriting the said policy
of assurance, well knew that the plaintiff in error was
born a Dutchman ; that the sum due to the plaintiff
in error, supposing him to be by law entitled to re-
cover a total loss, is 4,365 dollars 6 cents, and the
sum due to the plaintiff in error, for return of pre-
mium, supposing him to be by law entitled to re-
cover no more than a return of premium, is 700
dollars. After stating these facts, the verdict sub-
mitted the following questions to the decision of
the court.

1. Whether the plaintiff in error is by law enti-
tled to recover the said sum of 4,365 dollars and 6
cents, being the amount of a total loss ?

2. If the plaintiff in error is not by law entitled
to recover a total loss, whether he is by law entitled
to recover the said sum of 700 dollars, being the
amount of return of premium ?

3. If the plaintiff is not by law entitled to reco-
ver a return of premium, whether he is by law en-
titled to recover any sum whatever ?

On this verdict, the supreme court, after argu-
ment, decided, that the plaintiff in error was not
entitled to recover as for a total loss, on the said po-
licy of assurance, but that he was entitled to recover
a return of premium, whereupon judgment was en-
tered for the plaintiff in error, for the sum of 700
dollars.

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

In deciding on this case, BENSON, KENT, and RADCLIFF, justices, thus delivered their opinions.

BENSON, J. The principal inquiry in these causes. is, respecting the effect of a *foreign* condemnation, the property in the goods condemned, being intended in the insurance of them as neutral; whether the condemnation is not conclusive against the assured? This question has heretofore come before us, but until the arguments which have taken place in the present cause, it does not appear to me to have been so fully examined as the difficulty and importance of it require.

A condemnation may be viewed, as consisting in its cause and in its principles, as to be discriminated from each other; and the principles may be divided into those which relate to the law, and those which relate to the fact, comprehending in the fact the proofs.

The distinction between the cause and the principles of a condemnation is exemplified in a case read on the argument from a late English reporter, 7 *Term Rep.* Geyer v. *Aguilar*, where one of the judges distinguishes between them as here intended; he expresses himself: " The ground on which the courts in France proceeded, was, that this was a capture of *enemy's property*, and it certainly is not contrary to the law of nations, to condemn a ship on that *ground.* Whether or not those courts arrived at that conclusion by proper means, I am not at liberty to inquire," &c. which is equally as if he had said, the cause of the condemnation, as declared by the courts in France, is, that the ship was enemy's property; and which is a sufficient cause of condemnation by

the law of nations; but what were the *principles* of the condemnation, namely, what were the proofs, or what was the fact as found by those courts from the proofs, or what was the law as adjudged by them to arise from the fact, I am not at liberty to inquire, &c.

Insurances may be divided into general and special. A general insurance, is where the perils insured against, are such as the law would imply from the nature of the contract of a marine insurance considered in itself, and supposing none to be expressed in the policy. A special insurance is where, in addition to the implied perils, farther perils are expressed in the policy ; and they may either be specified, or the insurance may be against *all* perils.

We have had an instance of each kind of these special insurances; of the latter, in the case of *Goix* v. *Knox*, " where, besides the usual risks enumerated in printed policies, it was declared, by a clause in *writing*, that the assurance was to be against *all* risks." And in the former, in the case of *Gardiner & others* v. *Smith*, "where the insurance was against the risks, among others, of *contraband and illicit trade*," and the goods were seized at *Jamaica*, while landing, and condemned as contraband and illicit by the law of that place ; and cases may be supposed, where, although the property is insured as neutral, the insurer may, nevertheless, expressly take on himself the peril of condemnation, for breach of blockade, or for any other specified or enumerated cause ; and in every such case, should there be a condemnation, the assured must be allowed to show, either by the condemnation itself, if it furnishes the requisite evidence, and if not, then by such matter extraneous

to it, as, under the circumstances of the case, may be admissible in evidence, that the condemnation was for some *one* of the causes specified in the policy ; and so far, and to that intent, doubtless, the condemnation is examinable in the suit, by the assured against the insurer.

The cases at bar, are, as it respects the perils of condemnation, cases of general insurance, as here explained.

Where the property is insured as neutral, the law intends not only that the neutrality, as an ingredient or quality in the property or ownership of the goods then exists, but likewise that it shall be preserved during the continuance of the insurance, and consequently, that there shall not be any act or omission, either by the assured himself, or by others, whose acts or omissions may in that respect be deemed to affect him, to forfeit it ; and the neutrality constitutes as it were, a *title*, the existence and preservation of which, either in himself, or in the other persons, if any, on whose account the insurance may be made, or for whose benefit it may, in consequence of a subsequent transfer of the goods, be to enure, the assurance is deemed to warrant; and this warranty, from the assured to the insurer, is a condition of the insurance, or the indemnity from the insurer to the assured.

Every condemnation is either *rightful* or *wrongful* —If the captured goods, being duly defended in the court of the captors, by alleging and proving the title of the assured as above defined, should, notwithstanding, be condemned, the condemnation will be wrongful. Every other condemnation is to be taken

as rightful, including a condemnation by default, no person appearing to defend the goods; and where the condemnation is wrongful, it must be attributed either to the error of the *judge*, as it relates to the law, or as it relates to the fact as deduced from the proofs; or error in the witnesses, as it relates to the proofs, in testifying differently from the truth; and whether the error, either of the judge or the witnesses be innocent or wilful, can never affect the question, whether the assured hath or hath not, a right to controvert the condemnation.

If the assured has any such right, he must have it either limitedly, to controvert the principles which relate to the law, and not those which relate to the fact; or those which relate to the fact, and not those which relate to the law; and if to controvert those which relate to the fact, still he is to be *confined* to the proofs as they were before the judge, by whom the condemnation was pronounced; or he must have the right *unlimitedly*, or, as it is expressed in the case of *Hughes* v. *Cornelius*, 2 *Show*. 232, to controvert the condemnation " *at large*."

It will readily be perceived, that as the principal question, whether the assured is or is not to be concluded by the condemnation may be differently decided; so will the situation of the insurer be varied from certainty of safety, to the mere expectation or possibility of it. If the condemnation is to be conclusive against the assured, then, however, there may have happened a " capture, *a taking at sea*," and so the case within the very terms of the policy; yet if, further, there has been a condemnation of the goods, the insurer is safe in an absolute sense; but

ALBANY.

Vandenheuvel
v.
United  Insur.
Company.

if the assured may controvert the condemnation, the safety of the insurer then becomes uncertain of course; in like manner, though in less degree, may the situation of the insured be varied, as the several questions respecting the limitations of the right of the assured to controvert the condemnation, may also be differently decided.

In some cases it may be more favourable for the insurer, that the assured should controvert the law and not the fact. In others, again, that he should controvert the fact and not the law; and it must ever be most favourable to the insurer, that the assured should be precluded from producing *new* proofs; and this difference of situation must be viewed as material, in the *greater* number of cases, which probably will happen; not only so, but some may easily be conceived, where, as it respects the certainty, or possibility, that the assured can, or cannot, succeed in showing the condemnation to be wrongful may wholly depend on a different decision, one way or the other, of these questions, taken singly; before, therefore, it can be declared that the right of the assured to controvert the condemnation is limited, the rule whereby *some* of the limitations of it here suggested, are to be adopted, and others to be rejected *ought to be shown.* It may, however, be safely asserted, no such rule exists; the limitations themselves, the distinctions that where a judgment is alleged, the party against whom it is alleged, may controvert it as to the law, but not as to fact; or as to the fact, but not as to the law; and if as to the fact, that he is still to be concluded as to the proof, not being known in the law; and I cannot discern them, as

to be inferred from any thing peculiar in the contract of insurance ; so that the right of the assured to controvert the condemnation not being susceptible of limitation, if, therefore, he has the right, he must have it unlimitedly, to controvert the condemnation *at large*.

It is now to be stated, that where the property is insured as enemy's property and a capture by an enemy, the other belligerent party, it is inevitable that the goods will be both actually and rightfully condemned; they are as much lost to the assured as if they were captured by a pirate, and can no otherwise ever happen to be recovered to him than by a recapture ; and he may, in such case, abandon instantly on the capture. But where the property is insured as neutral, there are means, which, as to be distinguished from the forcible or physical means of recapture, may be denominated *moral means*, whereby, until a condemnation shall have taken place, it is *possible* the goods may be recovered : there may be a claim and defence of them in the court of the captor ; and although it is stated as *possible* only that the goods may, by a defence of them, be recovered; yet, if it was requisite to the argument, it might be stated as the intendment of law that it is *probable ;* for if the title of the assured should be duly alleged and proved, and the goods should, notwithstanding, be condemned, the condemnation, as has been already stated, must then be to be attributed to the error, either of the judge or the witnesses, and the law will never presume error *beforehand.* If, however, there is a *possibility* only, that, by a defence of the goods, a

F f

condemnation of them may be prevented, it is suffi-
cient to make it the duty, either of the assured or the
insurer, to defend them, or to bear the loss, if they
should be condemned undefended; but it will be
perceived the law can never impose it on the insurer
to defend them.

Where lands are granted with warranty, if the
grantee is sued by a person, claiming by better title than
the title of the grantor, he may, as it were, abandon to
the grantor; he can compel him to appear in court, and
defend the land; he may *vouch* him, and thereby
substitute him as the defendant to abide the event of
the suit " *for loss or gain ;*" and he is the party to be
presumed best cognisant of the title. Such is the
rule in the case of a warranty, in the nature of a ge-
neral contract of indemnity, from grantor to grantee ;
but if the assured may abandon to the insurer on the
capture, and impose the defence of the goods on him,
the rule will be reversed; the warrant*or* may then
substitute the warrant*ed,* as the defendant, and the
defence of the title will then be imposed on the party
to be presumed not only least *cognisant* but even
wholly *ignorant* of it.

The warranty in a grant of land being an indemni-
ty against the acts of others claiming by title, and
consequently not against entries by persons not so
claiming, nor against assumptions of the land by the
public authority of the state, nor as to any matter
which may have come to exist thereafter ; it may be
said to be an indemnity against title only, and not
against casualty ; and, accordingly, if there should
be a judgment against the title of the grantor, whe-
ther rightful or wrongful, he is alike held to indem-

nify the grantee for the loss of the land ; but where
the property is insured as neutral, the warranty of
the title, so far from being by the insurer to the as-
sured, being by the assured to the insurer, the in-
surance can be a warranty or an indemnity, not
against title, but against casualty only, against tor-
tious acts of private persons, and so unauthorised
by law, or the acts of the state, such as reprisals,
embargoes and impressments, the acts, in neither
case, however, proceeding on a supposed total ab-
sence, or a defect, or forfeiture of the title, as war-
ranted by the assured ; another consequence, there-
fore, of a supposed right in the assured, to abandon,
on the capture, and impose the defence of the goods
on the insurer, will be, that the insurance will there-
by be essentially changed from being an indemnity
against casualty only, to be likewise an indemnity
against title, and against a want of that very title,
which, as has been stated, the assured warranted
to be existing, and that it should be preserved.

Farther— If the assured may abandon on the cap-
ture, he is entitled then, also, to sue for the loss,
and the insurer must, accordingly, litigate the suit,
in expectation it may be in his power to prove either
that the property was not neutral, or that the neutral-
ity had been forfeited, and so a breach of the war-
ranty, and involving as a consequence, that the
goods may be rightfully condemned ; or he must
pay the loss *voluntarily*, and also *instantly*, any credit
allowed in the policy, being wholly of special or po-
sitive compact or regulation, and not arising from
the insurance considered in itself.   If he litigates
the suit on the policy, he must relinquish a defence

of the goods in the court of the captor, or expose himself to the palpable incongruity of insisting in the suit by the assured, that the goods may be rightfully condemned, and of insisting, at the same time, in the suit by the captor, that they are neutral property ; that the neutrality has been preserved, and therefore, that they cannot be rightfully condemned; on the other hand, if he voluntarily pays the loss, he then precludes himself from afterwards alleging a breach of warranty ; for, although I forbear from an opinion, whether the insurer can or cannot recover back the money paid for a loss, as having paid it, not knowing at the time, certain facts, which, if he had known, he might thereby have discharged himself from the insurance; yet, I have no difficulty in declaring, that the facts must be such as it may be supposed he could not be so apprised of them, as to be put on an inquiry, or to be on his guard respecting them, which, however, can never be said to be the case, where goods being insured, as neutral, are captured by a belligerent, it being to be intended, as will be more particularly stated hereafter, that they were captured, as charged to be enemy's property, although insured in the name of a neutral ; and, therefore, if the assured will, notwithstanding, voluntarily pay the loss, he will then be deemed forever to have waived or renounced his right to allege the breach of warranty ; and the case will be within the general rule, that if a party shall omit to allege a fact, existing at the time, and whereby he might have defended himself against a recovery, he shall not, as against the other party in the suit, be allowed to avail himself of it thereafter, and which was recognised in the court of errors, in the case of *Le*

*Guen,* appellant, v. *Gouverneur* and *Kemble,* re-
spondents ; where the appellant having placed goods
in the hands of the respondents, as his agents, to be
sold, and having himself made a contract for the
sale of them to *Gomez & Co.* but leaving the sale
still to be perfected by the respondents, the notes
given in payment, were, accordingly, to them in their
*own* names, and the vendees having, before the notes
became payable, proceeded to *France* with the goods;
" He demanded from the respondents an authorisa-
tion, to receive there, whatever sum should remain
of the proceeds of the goods, so sold on his account,
to the above vendees, after first deducting and reserv-
ing at their disposal, such sum as should be complete-
ly sufficient to cover them, for the general balance of
their account ;" and they refusing to give him the
authorisation, he brought a suit against them in this
court for the refusal, as for a breach of orders, where-
by they had become instantly liable for the value of
the *whole* of the sale, and on a special verdict he had
judgment, and to the amount so claimed by him.—
The respondents thereupon filed their bill in the court
of chancery, to the effect of a suit at law, to *recover
back* a payment, to enjoin him from proceeding on
the judgment, " suggesting, that subsequent there-
to, on the trial in the suit which they had brought on
the notes against the vendees, a verdict had been
found for the defendants, on the sole ground of a
fraud having been practised by the appellant in the
sale of the goods," by affirming or warranting them
to be of a better kind or quality than they were, " and
the chancellor ordered an issue at law to try the fraud.
A question, however, was reserved by the counsel
of both parties, to be determined as a preliminary

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

to the trial, whether the respondents were not precluded by the antecedent circumstances, from insisting upon the alleged fraud as a ground of relief? The chancellor decreed they were not so precluded, and confirmed the order for the trial, and on the appeal, the decree was reversed, and the respondents' bill in the court of chancery was ordered to be dismissed." If, therefore, the assured may abandon on the capture, and as the insurer must accept the abandonment, and pay the loss, then, although it might afterwards be proved *undeniably* in the court of the captor, that the property was not neutral, the insurer would, notwithstanding, be without any means of restitution.

These considerations are sufficient to show that the assured cannot abandon on the capture ; that it is necessary the goods should be defended in the court of the captor ; that the defence of them remains on him ; and that he cannot cast it on the insurer. It is, however, at the same time to be stated, that if, having made a defence in the court of the captor, the assured may still afterwards controvert the condemnation *at large* in the suit on the policy, it is obvious such previous defence can be estimated as a mere formality only ; that nothing is gained by it to the insurer, but that he is left in the like disadvantageous situation as if he, and not the assured, had to defend the goods in the court of the captor ; for although in the suit on the policy, instead of *defending* he will have to *defeat* the title of the assured, still the one case, equally as the other, involves the truth or falsehood of the *same* facts ; so that the reasoning, from what has been stated, terminates in this conclusion, that the *right* of the assured to contro-

vert the condemnation, if it does exist, can exist

no otherwise than to controvert it *at large ;* that it is his duty to defend the goods against a condemnation in the court of the captor, and that the right and the duty being incompatible, the right must be declared not possible to exist. Lest, however, the reasoning, as it may respect the question, whether the assured can or cannot abandon instantly on the capture, may be considered as inconclusive and unsatisfactory, unless it be shown when he can abandon, it may be requisite still briefly to state, that besides the case of a capture by an enemy, the opposite belligerent party, where the goods are insured as enemy's property, and a capture by a pirate, there is another case where the assured may abandon on the capture : The case of a capture by way of reprisal, and which, indeed, is in the nature of a capture by an enemy, but that every other capture being necessarily by a friend, in relation to the captured, must be intended to be that the goods are to be carried into a port of the captor, for a regular and authorised examination or adjudication, whether they are or not lawful prize, either as being *covertly enemy-property ;* or if neutral, that the neutrality has become forfeited, and the assured being held to follow the goods and defend them, and the condemnation being conclusive against him, should they be condemned, it results that he can abandon only in the event of their being restored to him, and the voyage, in consequence of the capture and detention, *broken up ;* and if the insurer shall, thereupon pay the loss, then, whatever right or remedy there may be against the captor, will enure to his benefit.

The practice in *France* has been urged as a prece-dent, and *Emerigon* has been read on the argument, to show what is there received as law on the subject. " The act of the prince is put in the class of ca-sualties (*La classe des cas fortuits*) and such also is the case (*Il en est de meme du fait*) as to the unjust sentence of a magistrate ; and it is of no importance whether the injustice proceeds from the corruption of the judge or his ignorance ; so that it is then cer-tain, that the insurers shall answer for an unjust con-demnation pronounced by the tribunal of the place into which the captured ship shall be carried, judg-ments rendered by foreign tribunals being of no weight in *France* against Frenchmen, the cause be-ing to be decided anew ; whence it follows, that a judgment of condemnation pronounced by an ene-my-tribunal, is no proof that there hath been a con-cealment of the *real* person *for whose account* the in-surance was made (*que le veritable pour compte ait ete cache*) nor any title (*un titre*) which the insurer may allege to avoid paying the loss. Such is our juris-prudence."—*Emerigon, c.* 12. *sec.* 20.

The last sentence may be expressed in other words —". such is our interpretation of the contract between the assured and insurer, as to the right of the assur-ed to controvert a foreign condemnation, the property being insured as neutral." The argument, as con-tained in what is here cited, is, that an insurance being an indemnity against casualty, and an unjust foreign condemnation being a casualty, an insurance is therefore an indemnity against an unjust foreign condemnation ; and the act of the prince being a casualty, the proof of the minor term in the syllo-

gism consists in an assertion, that the act or unjust sentence of a magistrate, is to be classed equally with the act of a prince among casualties ; whereas it is difficult to conceive two acts less of the same class or nature, and especially as it respects assured and insurer, than the act of a prince in the exercise of mere sovereignty, arresting goods either for permanent appropriation, or for temporary use, or detention only, and the act of the magistrate in function as a judge between captor and captured, condemning the goods as forfeited to the captors.  The act of the prince is arbitrary, and can be justified only from necessity, for reasons of state, and may consist with an admission of a perfect title to the goods in the captured, the person from whom they may be taken ; whereas the act of the magistrate is judicial, and if right, can be only so, as warranted by the law of property, and is in denial of the title of the captured.  In case of an arrest by a prince, the right of action of the assured accrues by the arrest, and, therefore, whether it can be justified or not, is never brought into question ; but where there is a condemnation by a magistrate, the right of action does not accrue by the condemnation itself, it can only be conceived to accrue by the supposed injustice of it.  If the arrest, the act of the prince, is of that class of acts for which the insurer is to answer ; then it is immaterial whether it is a foreign or domestic arrest, if the term " domestic" may, for the sake of brevity, be used and applied to an arrest by a prince, and a condemnation by a magistrate, to distinguish it as having happened in the same, and

G g

not in a different nation from that where the assured shall have sued on the policy, the insurer is equally to answer for the one as the other; but as it relates to a condemnation, the distinction between foreign and domestic is essential; the right, as contended for, being to controvert a foreign condemnation only; and, consequently, a domestic condemnation is always to be received as conclusive against the assured; hence it is evident, that if an unjust sentence of a magistrate is a casualty for which the insurer is to answer, it cannot be so as being of the same class with the act of the prince : or that if it should be admitted to be a casualty, as being so of the same class, or *like* an act of the prince, then, as the insurer is equally to answer for the arrest, whether it is domestic or foreign, so ought he, in like manner, to answer for the condemnation, whether it is domestic or foreign ; and, therefore, that as far as the argument for the right of the assured to controvert a condemnation, depends on a supposed *similitude* between an unjust condemnation by a magistrate and an arrest by a prince, and so far as it also depends at the same time on the distinction between a foreign and domestic condemnation, and that the right is only to controvert the former but not the latter, it is at variance with, and, consequently, defeats itself.

*Emerigon*, in farther support of the assertion—" that an unjust condemnation is a casualty, for which the insurer is to answer," refers to *Roccus*, Not. 54. " Merces captæ a potestate, seu judice justitiam administrante in illo loco, aut a populo, aut ab aliqua quacunque persona per vim, absque pretii solutione, tenenter assecuratores solvere æstimatio-

nem dominis mercium, facta prius per dominos mer-
cium cessione ad beneficium assecuratorum pro re-
cuperandis illis mercibus, vel pretio ipsorum a ca-
pientibus, ut probat *Stracc :* De Assecurat : Gloss :
20. et sequitur *Joan : de Evia* in Labyrint : Com-
mer. naval : *lib.* 3. *c.* 14. *numb.* 27 ; et melius fun-
datur ex dictis a *Santer :* De Assecurat : pars 4. num.
20. ubi adducit casum de injustitia facta, ab aliquo
judice ex quo merces amittantur vel damnum aliquod
sentiant, an comprehendatur sub promissione *casus
fortuiti* et assecurator teneatur ? Adducit Bart : in
L : exceptione col : penult : in fin : ff : de fidejus-
so ; ubi illud, quod judex facta injuste, quoad partes,
dicitur *casus fortuitus*, et pertinet ad emptorem rei,
et sic videtur in assecuratione quod pertinet ad illum
qui in se suscepit *casum fortuitum.*" I do not possess
the authors here referred to by *Emerigon*, but I find
the last, *Bartolus*, referred to by *Perezius*, as a
writer on the civil law. Recourse, therefore, must
be had to that law to discover the evictions of the
things sold (the condemnation intended by him as ca-
sualties, (*casus fortuiti*) and so belonging to the buyer
*qui pertinent ad emptorem*) to bear the loss himself,
to be as distinguished from those for which the seller
is to answer, in order thereby farther to discover,
whether in a suit judicially heard and determined
between captor and captured, a condemnation of the
goods as a prize to the captors for want of title in the
captured, and alleged to be wrongful, is an eviction
of the captured, the assured, for which the insurer
is to answer? " Tenetur de evictione venditor—
Porro evicta re datur emptori actio adversum ven-
ditorem—Est ex empto actio, quæ inest natura con-

tractus—Cessat evictionis præstatio ob culpam emptoris—Culpam committet emptor, neque de evictione agere potest, si, cum posset venditori denunciare, non denunciaverit motam controversiam, utque judicio adesset et rem defenderet, nam venditori poterat fuisse justa defensionis causa utpote *scienti melius* rei a se venditæ *jus* et *conditionem*—Ac sic in causa evectionis sententia lata contra emptorem ei sit *regressus* contra venditorem si *vocatus* ab emptore venditor in judicio comparuerit ad *rei* defensionem eam que susceperit, quia nihil est quod imputetur emptori, qui, ut requiritur, denunciavit venditori motam litem, cui, quod eam defendere non potuerit, imputandum erit." *Perezii Prælect :* in *lib. 8. cod. tit. 45. de evictioneb.* From these passages, it is evident, that the evictions, intended by *Bartolus* to be deemed *casualties,* and so the loss by them to be borne by the buyer, must be of a different class or kind from an eviction for the want of title in the seller, he having been vouched to appear and defend his title (vocatus ut in judicio compareat ad rei defensionem) and the civil law, as to the warranty from the seller to the buyer, in respect to the eviction, or other act whereby the buyer may lose the thing sold, when the loss is to be borne by the buyer, and when the seller is to answer for it, being the same with our own law, it is not necessary, as an answer to the argument, from the supposed analogy between the case of seller and buyer, and the case of assured and insurer, to add to what has already been stated in comparing or contrasting a warranty in a grant of lands, with an insurance, the property being insured as neutral; and it only remains to be re-

marked on *Emerigon*, considered as an *authority*, that *Roccus* himself, on whom he relies, does not, by the act of the judge in taking the goods, and for which the insurer is to answer, intend a judicial act or procedure between captor and captured in a case of taking or capturing goods as lawful prize ; the taking, as he describes it, being within the territory where the judge has jurisdiction, (captæ judice jus-titiam administrante *in illo loco*) but a taking as a prize, it is to be supposed, would have been mentioned by him as taken at sea. That the injustice of the taking consists in its being without paying for the goods, (absque solutione pretii) necessarily import-ing that the captured, the person from whom they were taken, was entitled to be paid for them, and which again necessarily affirms his title to them ; but when the goods are taken from the captured, and ad-judged to the captors, the injustice, if any, as it re-spects the act of the judge, consists in an error in him in disaffirming any title in the captured, but not in his awarding the goods to the captors without any recompence to the captured. The official act, there-fore, of the magistrate, in taking the goods intended by *Roccus*, can be no other than an act in the nature of an impress, and for which the insurer is unques-tionably to answer ; and that to suppose an unjust sentence a casualty, so as that the insurer is to an-swer for it, is altogether fallacious ; casualty being applicable only to a fact possible, that it will or will not happen, until it either shall have happened, or, by the intervening happening of some other fact, shall have become impossible ever to happen ; in each case, however, it equally ceases to be casual,

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

and becomes certain, in the one that it has happened, and in the other that it cannot ever happen ; but that casualty is not applicable to the sentence of a judge on the question, whether it is just or unjust, or to any other mere opinion, whether it is right or wrong, declared on any subject. For although it may be afterwards demonstrated that the opinion is right, or that it is wrong, yet it never can become either certainly right or certainly wrong, as having before been casual, whether it would be right or whether it would be wrong. It is true that the law has ordained that every judgment, until reversed, shall be taken to be certainly right ; if it should be reversed, it is then to be taken as certainly wrong, and the judgment of reversal is to be taken as certainly right. If the judgment of reversal should be reversed, the first judgment being thereby affirmed, is again to be taken as certainly right, and the judgment of reversal as certainly wrong ; but this legal or artificial certainty is in no manner the same with that certainty existing in nature, and having as its opposite, casualty. Certainty, as opposed to casualty, is to be proved as a fact, to have either physically happened, or become impossible to happen, and not to be demonstrated as a proposition, either morally right or morally wrong. The opinion whether a sentence is just or unjust, may be ambulatory forever. Thus it is manifest, that the practice in *France* is erroneous ; and there is reason to suppose it to have proceeded from a misapprehension of the very authorities cited to prove it warranted by law or principle. It, however, having obtained, and being established in fact, in the nature of a custom, or usage, it ought, per-

haps, not to be changed there; for both parties be-
ing apprised of it, they can make their calculations,
as to the risk and premium, accordingly, and in that
view of it, no injury will be produced by it ; but
it certainly can have no influence on the present in-
quiry, which is, as to the *true interpretation* of the
contract, according to *universal* law, independent of
any positive local practice whatever.

ALBANY.
Vandenheuvel
v.
United Insur.
Company.

I will now briefly apply to the case of an insurance,
the law, as declared in the case of *Hughes* v. *Corne-
lius*, already cited, it being the most ancient case in
the books, as to the effect of a foreign condemna-
tion ; and the adjudication which took place in it,
having never been questioned, the case is now to be
viewed as of the highest authority.

The judges, in that case, not only assume it, that
a domestic condemnation is to be received as con-
clusive, but they suppose that, therefore, a foreign
condemnation ought likewise to be so received ; they
argue the conclusiveness of the latter, from the con-
clusiveness of the former; they express themselves,
" as we are to take notice of a sentence in the admi-
ralty *here*, so ought we of those *abroad* in other na-
tions, and we must not set them *at large* again." It
is true, the question was only as to the *direct*, and not
as to the *collateral* effect of a condemnation; but the
reasoning with which the judges close their opinion,
that a foreign condemnation is to be conclusive, as
to the direct effect of it, namely, " that if the cap-
tured is aggrieved, he must apply himself to the
king and council, it being a matter of *government*,
he will recommend it to his liege's ambassadors, if
he see cause, and if not remedied, he may grant

letters of mart and reprisal," will equally apply, that it is to be conclusive as to the effect of it on an insurance ; and not only contains a sufficient answer to' the objections, to receiving it as conclusive, as to such effect of it, but obviously supposes, that as to the several effects of a condemnation in respect to the conclusiveness of it, there is no difference between them.

The objections to receiving a foreign condemnation as conclusive against the assured, if I have rightly understood them, and, indeed, as some of them are expressed by a late English writer, on the law of insurance, *Park*, 363, also read on the argument, are, " that the judges of a foreign nation may possibly decide on their own municipal laws or ordinances, contravening, or not forming a part of the law of nations ;" and further, that the judge of a belligerent nation cannot be viewed as standing indifferent between a neutral nation and his own, in deciding on the interfering rights of neutrals and belligerents, as depending on, or to be deduced from, the *law of nations*.

That even the most enlightened and upright judges may oftentimes, and in a great degree be under the influence of *national* partiality, can scarcely be denied ; such is human nature, " *Parum cavet natura.*" But can neutral nations say they are less susceptible of interest or passion, than belligerent nations ? Is not the armed neutrality in Europe, in 1780, to compel the *British* to acknowledge and observe it as a principle of the law of nations, that free ships make free goods, a proof of directly the reverse ? Can our nation claim us, or can we claim ourselves, to

be more free than the judges of belligerent nations, from national partialities? If the assured is warranted in surmising a partiality in the belligerent judge, is not the insurer equally warranted in surmising it in us, and, consequently, will not justice between them as to the question, and according to its just and equal merits, whether the principles of the condemnation, as.they relate to the law of nations, are right or wrong, be alike to be suspected as fallible, when declared by us, as when declared by the judges of the belligerent nations? But a sufficient, and, perhaps, the most proper answer, to the whole of the objection, is furnished in substance, by the judges in the opinion above cited, from the case of *Hughes* v. *Cornelius*, that if a judge of one nation, in a case of a capture at sea, will assume novel and false principles, as principles of the law of nations, or misapply, or unduly extend, or restrict such as may have been already received and sanctioned, or misinterpret a treaty, or decide wholly on the particular regulations of his own nation, repugnant to, or deviating from the law of nations, or by whatever other erroneous reasonings or means, considered as the principles relative to the law in the case, he shall come to it as legal conclusion, that the goods captured, ought to be condemned as prize, either as being enemy-property, or for breach of blockade, or as being contraband of war, or for any other cause whatever, every such condemnation would be a grievance on the captured, against which his nation is to claim and procure reparation for him. It would be perfectly a *casus fœderis*, a case where the nation, in virtue of the mutual obligation

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

H h

of allegiance and protection, between sovereign and subject, would be held to interfere and remonstrate against the principles of the condemnation, and insist that they be disavowed or renounced, and that reparation be made to the captured ; who, instead of seeking for indemnity from an underwriter, through the medium of a court of justice, must seek for it from the foreign nation itself, through the medium of the government or sovereignty of his own nation.

I conclude, with remarking, that possibly, as I have already intimated, an insurer may, by especial or express insurance, take on himself the peril of an unjust condemnation ; and something of that kind has been attempted, by inserting a clause in the policy to the following effect : " Warranted American property, and proof thereof to be made, if required, in *New-York* only ;" but whether an insurance in this form, is sufficiently provisional or explicit ?— Whether it would be deemed to be against a condemnation for *any* cause, or against a condemnation for *some* causes only, and not *others ;* and if so, which the causes are, as to be discriminated from each other ? And especially, whether the assured may abandon on the capture, or whether he is not bound to follow the goods into the court of the captor, and there defend them ? Or, in short, whether it is possible to devise a form, fully and distinctly providing for all the cases and events which may occur ? Or, whether it is not unavoidable, that the whole must be put on the simple footing of a *war-premium*, and a *war-risk ;* so that all understanding, representation, or warranty, that the property is neutral, and that the neutrality is to be preserved, and not forfeited, are to be altogether laid out of the

contract between the parties ?   are questions which
I suggest, as probable to arise, but on which it is
not necessary that I should express an opinion in
deciding the case at bar, it being a case of gene-
ral insurance, and where, for the reasons I have as-
signed, my opinion is, that a foreign, equally as a
domestic condemnation, is to be received as conclu-
sive against the assured.

RADCLIFF, J.   This was an insurance on the
freight of the *Astrea*, from New-York to Corunna in
Spain.   The policy was subscribed by the defend-
ants on the 19th November, 1798, in consequence of
a written representation from the plaintiff, stating
the ship, freight and cargo *to be his property.*

The plaintiff was originally a subject of the Unit-
ed Netherlands and continued so till the 3d January,
1793, when he was naturalized as a citizen of the
United States.   He must, of course, have emigrated
to America at least two years antecedent to that pe-
riod and before the United Netherlands were invol-
ved in the late European war, and he is stated to
have been personally known to the defendants.

The vessel during the voyage was captured by a
British frigate as *prize,* carried to Gibraltar, and with
her cargo, there condemned by the court of vice-
admiralty, on the ground of her " belonging at the
time of her capture to *Spain,* or to persons being
subjects of the king of *Spain,* or inhabiting the ter-
ritories of the king of *Spain,* enemies of *Great-
Britain.*"   From the situation of the plaintiffs, and
the representation to the defendants, the insurance
must be considered as made upon *American* or *neu-
tral property.*   The representation is to this purpose
equivalent to a warranty of that fact, and liable to the

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

\* *January*
Term, 1799.

† *April* Term,
1800.

same result. In my view of the subject two ques-
tions arise.

1st. Whether, upon the *terms of the contract*, the
plaintiff is entitled to recover?

2d. Whether, in respect to the *fact of neutrality*,
he is *concluded* by the foreign sentence?

If upon the contract he would be· entitled to re-
cover, and is not concluded by the sentence, it is
conceded or offered to be proven that the property
was in reality neutral, or such as was so represented
to the defendants.

The second question has already been twice de-
termined in this court ; first, in the case of *Ludlow*
and *Dale*,\* in which I gave no opinion, it being ar-
gued before I took my seat ; and secondly, in the case
of *Goix* and *Low*.† In the last, although the sub-
ject in some respects presented itself to my mind in
a·different light, I was content to acquiesce in the
opinion which had been previously delivered, consid-
ering the rule to have been definitively settled as far
as depended on this court. The magnitude of the
question has induced us to review it in this and
other causes, but notwithstanding the able and zeal-
ous discussion it has received, I can perceive no new
lights on which to change my opinion.

It may be premised that in the course of the argu-
ment much was said of the policy of the *English*
courts in deciding this question in favour of the in-
surer; and the policy of our adopting a different rule.
On a careful examination of the *English* decisions,
I cannot discover any ground for this suggestion.
They appear to rest on principles unconnected with
any motive of policy, and are indiscriminately ap-
plied to their domestic as well as to foreign tribunals,

If the consideration were proper in determining a rule for ourselves, I am unable to perceive its force or application.

In every instance of a foreign condemnation a loss must necessarily happen. If the property be really American, and insured here, the burthen must fall on some of our citizens. It is then a question between them solely, and it can never be politic or just to seek to shift the loss from one description of citizens to another. If the property be not American, and insured in this country, an interested policy, if such could be justified, would dictate an opposite rule of decision, and lead to protect the American insurer against the foreign owner, and thus determine the question against the insured.

Again, if the property be American, and insured abroad, the remedy is placed beyond the reach of our laws, and it would be a vain presumption in the courts of this or any other country to attempt to prescribe a rule for foreign tribunals. But I dismiss this topic as unconnected with the merits of the question. Opinions founded on policy are necessarily various and fluctuating, and ought never to actuate a court of justice. The question in every instance must depend on its intrinsic merits arising from the nature of the contract and the general law of insurance, unless restrained by positive regulations.

In this view of the subject, the judicial determinations of courts in different countries, as well as the opinions of individuals, may differ, but that difference, I apprehend, can never, as has been imagined, become a matter of *national* concern. The regular administration of justice, when conducted with good

ALBANY.
Vandenheuvel
v.
United Insur.
Company.

faith, can never implicate the government with re-spect to foreign nations ; and whatever rule may be established on this occasion, it can only be considered, as affecting the rights of our own citizens ; as exist-ing between them solely. If foreigners should at all be interested, it must happen in consequence of their voluntary act to seek insurance here, and they cannot complain of the conduct of our courts, if they receive the same measure of justice which is ad-ministered to others. I therefore equally lay out of view every argument derived from this source.

It is true there may be cases to interest the *gov-ernment* in behalf of its citizens. When losses are sustained by the unjust sentences of foreign tribu-nals, there is no doubt but the party injured is enti-tled to apply to *his government* for redress, and that government, in case of *palpable injustice*, has a right to demand and enforce reparation from the sovereign of the aggressor—it is even bound to do so, or in its discretion to grant reprisals, or an indemnity to the injured party. It then and not till then becomes a question of *national* concern. As such, the delicacy and importance attached to it, as to all national ques-tions, would require the government to proceed with caution, and in doubtful cases rather to presume that justice has been done than to impeach the integrity of foreign courts. Thus it is held that it ought not to interfere but in cases of violent injuries, counte-nanced and supported by the *sovereign* of the ag-gressor, and where justice is absolutely denied *in re minime dubia* by all the tribunals and in the last re-sort.* This is the language of the most approved writers on public law, and is professed to be the practice of all civilized nations, and one† of those

* *Gro. de Jure,*
*&c. lib. 3. c. 2.*
*sec. 4, 5. 1 Coll.*
*Jur. 102, 3.*
*Vatt. 257, 8.*
† *Vatt.* The re-port on the
*Prussian* me-morial.

writers, perhaps the most eminent and correct, ex-

emplifies the maxim by referring to the principles maintained by the *British* government on a similar occasion. Hence it will be admitted, as a general rule, that every government is bound to respect the judicial decisions of foreign courts, and in the first instance to consider them as just and of course gene- rally conclusive. But these reasons for the rule are strictly applicable to the government alone when acting in behalf of its citizens. They cannot apply to the conduct of our courts in the ordinary adminis- tration of justice. We actually see that the courts of *France* and *England* differ on the very question before us, and it has never been deemed a subject of *national* complaint by either.—I therefore think that it is not on the ground of *national* interference or courtesy that such sentences in our courts are held to be conclusive.; their conclusive quality depends on other principles.

1st. As between the insurer and insured, in case of a representation or warranty of neutral property, I think a condemnation in a foreign court of admi- ralty, when founded on the want of neutrality, ope- rates definitively against the insured according to the terms and effect of the contract itself. During the existence of a maritime war, the state of commerce is necessarily more or less precarious. Neutrals are not exempt from this inconvenience, but neutrality, if respected, affords a great advantage. The neutral merchant, when he effects an insurance, may either retain the benefit of his neutrality, or, if diffident of its security, he may relinquish it, and specially in- sure his property against every possible loss. If he

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

insure the property as neutral he thereby signifies his intention to avail himself of his neutrality, and of course will pay a less premium ; but in doing this it must follow that he takes upon himself the risk of that neutrality. He thus far *divides the risk*, and is to be considered his own insurer. He cannot, by paying a less premium, enjoy the benefit of his neutrality and at the same time the benefit of an insurance for the want of it.

It is obvious that every such representation or warranty is made, not with a view to an examination of the fact in our own courts, but in reference to the parties at war, and to the danger of capture and condemnation abroad. This is the direct object of the stipulation. It cannot be limited to the naked position that the property is in fact neutral. It may be so and yet possess none of the *indicia* or evidences of neutrality. These evidences, it is not denied, the insured undertakes shall accompany it, and I think he equally undertakes that it shall enjoy the privileges of neutrality.

There appears to me no room for the distinction that the insured engages to furnish the evidences merely, and at the same time not to maintain his neutrality when it may be called in question. If the proper evidences accompany the subject, it is not legally to be presumed that its neutrality cannot be maintained. Whatever abuses may occasionally be committed we cannot act judicially, nor suppose the parties to have acted on the presumption of injustice in foreign courts. The idea is inadmissible when applied to the courts of a civilized nation, and if contemplated by the parties ought at least to have been

made the subject of a special provision in the con-
tract. No doubt the underwriter may, by a special Vandenheuvel
insurance, and the admission of a particular mode of United  Insur.
proof, make himself liable even for the unjust sen- Company.
tences of foreign courts; but he ought never to be
held liable for such sentences when proceeding on
the very ground assumed by the insured himself.
If neutrality can be called a risk, that risk is neces-
sarily implied in the warranty; and the insurer, by the
contract, is liable only to the remaining perils inci-
dent to the subject, allowing it to be neutral and to
preserve that character. He engages for nothing
more; and his premium must be deemed proportion-
ed to those perils only. The effect of the repre-
sentation or warranty, can, I think, on the face of the
contract itself, admit of no other interpretation.

If this reasoning be correct, it follows, that the in-
sured, having represented or warranted the subject to
be neutral, can never, on the terms of the contract
itself, recover against the insurer when it appears to
have been condemned on a ground which denies its
neutrality. It is immaterial, in this view of the sub-
ject, whether the condemnation be just or unjust; it
is sufficient if it proceed on the want of neutrality.

2. The question in the *English* courts does not
appear to have been examined in this light. They
have been content to apply to the decisions of fo-
reign courts of admiralty, a principle which has long
been received and adopted in their domestic courts.
They place them on the same footing, and consider
the conclusiveness of their sentences as necessarily
resulting from the right of jurisdiction. In relation
to their own courts the rule has undoubtedly been

I i

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

long established, both before and since the revolu-
tion, and it is not confined to courts of peculiar or ex-
clusive authority, but applies to all. Not only the
sentences or judgments of their ecclesiastical and
other courts, where they possess exclusive cogni-
zance, but the decisions of all their courts in cases
where they have concurrent jurisdiction are deemed
to be equally conclusive. Indeed, a contrary posi-
tion would involve the absurdity of a power compe-
tent to decide, and at the same time ineffectual in its
decision.

They have also, in a variety of cases, extended the
rule to foreign courts of a different description.
Thus, a bill to be relieved against actions of trespass
for seizing goods* in an island of *Denmark* was dis-
missed in chancery, because sentence was given in
the court of *Denmark* on the seizure. So in case† of
a bill of exchange, the acceptance of which was va-
cated in a court of *Leghorn*, Lord Chancellor King
held not only that the cause was to be determined by
the *lex loci*, but the acceptance having been vacated
by a competent jurisdiction, he thought the sentence
conclusive, and that it bound the court of chancery
in *England*. So by Lord Hardwicke,‡ if a marriage
be declared valid by the sentence of a court in *France*
having proper jurisdiction, it is conclusive, and he
held " that this was so, although in a foreign court,
by the law of nations; for otherwise the rights of man-
kind would be very precarious and uncertain."

This doctrine applies, with peculiar force, to the
sentences of courts of admiralty in relation to *prize*,
and of every court proceeding on the general law of
nations as the basis of its authority. While the cap-

* 1 *Ch. Cas.* 237.
26 *Car.* 2.

† 12 *Vin.* 87. *pl.*
9. 2 *Stra.*732,3.
S. C. best re-
ported in *Viner.*
(1726.)

‡ 1 *Vez.* 159.
(1748.)

ture of enemy-property is admitted to be the right of
a belligerent party, the institution of courts to try the
validity of such captures must also be admitted.
They exist in every country, and are established in
our own.  The objects of their institution are every
where the same.  They are invested with similar
powers, pursue the same principles, and profess to be
governed by the  same system of laws, unconnected
with the municipal regulations of any country.  In
this manner they form a separate and independent
branch of judicature, and although uncontrouled by
a common superior, their determinations, while they
act with good faith, will generally be uniform and con-
sistent.  Considering them in this light, acting on
the same  principles, and governed by the same law,
they come within the reason of the rule which is ap-
plied to domestic tribunals of concurrent jurisdic-
tion, and their decisions ought to possess equal force
and authority.

But another principle of *English* and *American*
jurisprudence, arising from the nature of the subject
and the system of our courts, appears to me strongly
to enforce this doctrine.—The question of neutrality
is involved in the general question of *prize*—it is a
necessary incident, and the want of neutrality forms
the principal ground of capture and condemnation.
It is a settled maxim, that the courts of common law
have no jurisdiction on the question of prize ; it
may collaterally arise, but *ex directo* it is not within
their cognizance—it belongs solely and exclusively
to the courts of admiralty as courts of prize.—This
is established by a current of authorities both ancient
and modern, and the reasons on which they are

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

founded are satisfactory and conclusive. If then the courts of admiralty have exclusive jurisdiction of the principal question of *prize*, which necessarily includes that of neutrality, and the courts of common law have no jurisdiction, it must follow that the decisions of the former cannot be reviewed by the latter, and that whenever they occur directly or collaterally they must, like the judgment of other courts of peculiar jurisdiction, be considered as conclusive. If they were allowed to be reviewed, in what manner could we ascertain the merits of the former decision ? Is the same evidence in our power, or in the power of the parties to obtain ? The insurer is a stranger to the whole transaction ; the circumstances are unknown to him ; the proofs, if not detained abroad, are in the hands of his adversary ; they are generally con_cealed, or may, with the greatest ease, be suppressed. How could he compel their production, or bring to light the merits of the case ? To avoid these diffi-culties are we to be governed by the written deposi-tions taken in the admiralty abroad, or could they be received as evidence ? It is well known that the rules of evidence in those courts are different from our own. By what rules are we to be governed ? If ex-clusively by our own, the result in our courts may differ, and yet both judgments as to the evidence on which they are founded be equally just. Allowing even that the insured engages merely to furnish the evidence of this neutrality in foreign courts, that evidence must surely be understood to be of a na-ture usually received and demanded in those courts ; for it is there only that it can be material. The en-gagement, relating to such evidence of course ex-

cludes the idea of a decision upon any other, and the interference of a court of common law, requiring a different mode of proof, and acting on different principles, would contravene one of the direct objects of the stipulation. In every shape, therefore, in which this subject can be viewed, insuperable difficulties present themselves, and evince the propriety of considering the foreign sentences as final.

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

In *England* this question is at rest by direct decisions on the point, but these decisions were principally made during the period of our revolution, or subsequent to it—they possess, therefore, no conclusive authority, but under similar circumstances are to be regarded as we regard the decisions of the courts of all enlightened nations, high evidence of the law on the subject.

The cases in the *English* courts previous to the revolution are, however, not wholly silent on the question; so far as they relate to the general principle that the sentence or judgment of any court of competent jurisdiction is to be received as conclusive, they have already been noticed.

There are some which immediately apply to the sentences of foreign courts of admiralty.— The first in which the effect of such sentences appears to have been immediately considered, was the case of *Newland* v. *Horseman*,* in chancery. That was on a question of *freight*, which had been tried in the court of admiralty at *Barcelona*, where an interlocutory judgment was given.—Lord Chancellor Nottingham declared, that he would not slight their proceedings beyond sea, and if the damages had been there ascertained, or a peremptory sentence given, the same should have concluded all parties.—

*1 *Vern.* 21. 2
*Ch. Ca.* 74. S. C.
(1681.)

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

* Carth. 32. 2
Show. 232. S.C.
(1689.).

The next is the case of *Hughes* v. *Cornelius*,* in which, during a war between *France* and *Holland*, an *English* ship was taken by the *French* under colour of being *Dutch*, carried into *France*, and there condemned by the court of admiralty as a *Dutch* prize. Afterwards an *Englishman* bought this ship, and brought her into *England*, where the right owner instituted an action of trover for the ship against the purchaser. This matter being found specially, the defendant had judgment, " because the ship being legally condemned as a *Dutch* prize, this court will give credit to the sentence of the court of admiralty in *France*, and take it to be according to right, and will not examine their proceedings, for it would be very inconvenient if one kingdom should, by peculiar laws, correct the judgments and proceedings of the courts of another kingdom." In the *Theory of Evidence*,* a book considerably ancient, it is stated, that " in an action on a policy of insurance, with a warranty that the ship was *Swedish*, the sentence of the *French* admiralty condemning the ship as *English* property was held to be conclusive."† The same case is repeated *in hæc verba* by Mr. *Buller*, in his *Nisi Prius*, and has received the sanction of his name. He cannot be understood to refer to the case of *Hughes* and *Cornelius*, as has been suggested, for that was not of a *Swedish* ship, nor on a policy of insurance. There is still another case§ of *Fernandez* v. *De Costa*, in 4 Geo. III. before Lord *Mansfield*, at *Nisi Prius*, in which there was a warranty that the ship was *Portuguese*, and being condemned as not being *Portuguese* in the admiralty courts of *France*, the sentence of condemnation appears to have been considered as

† An Irish ed. printed in 1761. *p*. 37.

‡ *Bull*. 244.

§ *Park*, 178, 3d ed. not elsewhere reported.

decisive in favour of the insurer.   In this case, it
seems, the law was received to be settled as to the
effect of the sentence, and the inquiry was confined
to ascertain the ground on which it went.

In answer to the two former of these cases a distinction has been taken between the direct and collateral effects of a foreign sentence, that it is conclusive only as to the transfer of property for the benefit of all claiming under it, but not so as to collateral parties.   I do not perceive the force of this distinction.—If well founded it appears to me to operate in favour of the insurer; the insured, the professed owner of the property, must certainly be a direct party to the sentence, if any one is a party; he, therefore, if any one, must be concluded.   Besides, from the nature of the proceedings in courts of admiralty, which are *in rem*, all persons are considered as bound. The forms and manner of proceeding in those courts are founded on the idea of notice to all the world, and the operation of their sentences is deemed to be equally extensive.   The distinction now attempted, I do not find to be supported by any authority either before or since the revolution.   Indeed, in *England*, the contrary rule prevails both with respect to their domestic and to foreign courts.   It is general, that, " whenever a matter comes to be tried in a collateral way, the decree, sentence, or judgment of any court, ecclesiastical or civil, having competent jurisdiction, is conclusive evidence of such matter."*   It is not * *Theory of Ev.* material that the parties to the suit should have been 37.  *Bull.* 244, parties to the sentence; the only qualification of the *Amb.* 762, 3. & rule, I believe, is to be found in *Prudham* v. *Philips*,† the cases there cited. 2 *Black.* where Chief Justice *Willes*, in the case of a judg- *Rep.* 977. ment alleged to be *obtained by fraud* in the ecclesi- † *Amb.* 763.

astical court, took a distinction in favour of a *stranger*, who could not come in and vacate or reverse the judgment, and, therefore, must of necessity be permitted to aver the fraud; but he held that the party to the suit was bound by the sentence, in relation to all other persons, and could not give evidence of the fraud, but must apply to the court which pronounced the sentence, to vacate the judgment. It is, therefore, always sufficient, if the one against whom the sentence is offered, was a party.

I forbear particularly to examine the subsequent cases,* during our revolution, and since, which, if any doubt could before exist, have unequivocally settled the law in *England*. The principle on which they are founded, is, I think, sufficiently supported by the antecedent cases. The English courts appear to have viewed those cases in the same light, and without treating the question as *res integra* have adopted the rule they prescribe. Indeed, from the time of Charles II. to the present period, it appears to have received a steady determination by the highest authorities in their courts. With them it seems never to have been much questioned, and, I conceive the law with us, must be deemed to be equally settled. It may be added, that the same point arose in *Pennsylvania*,† and, although not directly decided, Judge *Shippen* inclined to consider the foreign sentence as conclusive against the insured.

In *France*, the law is undoubtedly otherwise settled.‡ Their courts have adopted a different rule at an early period, and the authorities on which they proceed, in cases of new impression, would merit great attention and respect; but independent of the circumstance that they confer no obligation on our

* *Doug.* 544.
*Park,* 359, 361,
2—three cases.

† 2 *Dall.*

* *Emerigon,*
457 to 464.—
*Val.* 112. *art.*
48. See also
*Rocc. n.* 54.

courts, I think they do not comport with the sound interpretation of the contract, nor with the system of our jurisprudence. The English courts, on questions of commercial law, are to be regarded as at least equally enlightened and correct, and their authority, before the revolution, repeatedly sanctioned and confirmed by subsequent determinations, imposes an obligation which the former do not possess.

In every light, therefore, in which I have been able to view the subject, I am of opinion, that the foreign sentence ought to be deemed conclusive against the plaintiff's right to recover on the policy.

1. From the nature and import of the contract itself, by which I consider the insured to have guaranteed his neutrality and undertaken to maintain it, and, of course, liable to all the perils attending it.

2. Because the condemnation is to be considered as conclusive evidence of the want of neutrality, it being the sentence of a court, not only of a *competent* but *exclusive* jurisdiction on the subject.

KENT, J. This cause is on a policy upon the cargo and freight of the ship *Astrea.*

The facts are these.

The voyage was from *New-York* to *Corunna,* in *Spain,* and the ship was described as the good American ship the *Astrea ;* and previous to the time of signing the policy, the plaintiff, in a written application for that purpose, to the respective defendants, represented the property to be *his own.* The ship was captured on her voyage by a British frigate, carried into *Gibraltar,* and by the court of vice-admiralty there, the ship and cargo were condemned as lawful prize, as belonging, at

K k

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

the time of the capture, to *Spain*, or to persons; being subjects of the king of *Spain*, or inhabiting within the territories of the king of *Spain*, enemies to the king of *Great-Britain*.

If the plaintiff is not to be adjudged concluded by the sentence, it is then admitted in the case, to be a fact, that the ship and cargo were the plaintiff's property.

The plaintiff was born a subject of the *United Netherlands*, and became a citizen of the *United States*, on the 3d day of *June*, 1793, and has since resided in the city of *New-York*.

Upon these facts, the whole question between the parties, turns upon the effect of the sentence of condemnation. If that is to be deemed conclusive proof of the facts therein stated, the policy is void, by reason of a breach of warranty, and by reason of a *material misrepresentation*, which led the underwriters to compute the risk upon circumstances which did not exist.

The sentence substantially *falsifies* the representation, for the persons, stated in the sentence as owners of the property, and the plaintiff, were evidently understood and intended to be different persons.

After the opinion which I have already given upon *January*,1799. the question, in the cases of *Ludlow* and *Dale*,* and † *April*, 1800. of *Goix* and *Low*,† I might well be excused from entering again upon the subject, unless, in the mean time, I had seen sufficient reason to change that opinion. The question has, indeed, been since presented in a way the most propitious to a liberal reconsideration of its merits. The authorities, and the principles they contain, have been examined at the bar;

with a diligence and ability, that have greatly aided our researches, and thrown light on the avenues to truth. It seems, then, in a degree due to the occasion, to the elaborate and anxious care which has been bestowed on the subject, that I should once more, but very briefly, and without recapitulating what I have before said, take some further notice of the argument.

The true point in controversy is not what *ought* to be, but what in fact *was*, the legal effect of a foreign sentence of condemnation, in a case like the present, by the common law, as understood and settled when our revolution began. I shall confine myself in this opinion, to the examination of this *single* point.

Let us first inquire what is the effect of a domestic judgment.

It is laid down as a general rule,* that whenever a matter comes to be tried in a collateral way, the final sentence of any court, having competent authority, is conclusive evidence of the matter so determined, in all other courts, having *concurrent* jurisdiction; for, it were very absurd that the law should give a jurisdiction, and yet not suffer what is done by force of that jurisdiction to be full proof.

It has, however, been made a doubt by some,† whether such sentences upon jurisdictions, having concurrent authority, be conclusive, or only *prima facie* evidence of the fact, although I think the better opinion is in favour of their conclusive effect.

But if a matter belongs to the jurisdiction of one court so *peculiarly* as that other courts can only take conusance of the same subject indirectly and incidentally, the rule is then more extensive and un-

ALBANY.

Vandenheuvel v. United Insur. Company.

* *Buller's* N. P. 244, 245. *Amb.* 761. *Freeman,* 84. *Str.* 733. *Harg. Law Tracts,* 465, 469.

† *Harg.* 477. 3 *Mod.* 231.

ALBANY.
Vandenheuvel
v.
United Insur.
Company.

* *Hargrave's
Law Tracts,*
452, 457, 470,
477.

.equivocal.*   The latter courts are bound by the sen-
tence of the former, until it be reversed, although
it be in a suit *in diverso intuitu,* if it be directly de-
termined, and must give credit to it universally, and
without exception.

This rule has been illustrated in the case of sen-
tences in the ecclesiastical courts touching marriages
and wills ; in the exchequer, touching the condem-
nation of forfeited goods ; and in the admiralty,
touching prizes, and in all of which cases, those
courts have exclusive jurisdiction.

In respect to the ecclesiastical courts, the autho-
rities are numerous, and have spoke an uniform lan-
guage from the time of lord *Coke* to the present day.

† 4 *Co.* 29 *a.* 7
*Co.* 43 *b.*

In two cases, to be found in his reports,† the judges
determined that they were bound (although it was
even against the reason of the law) to give faith and
credit to the sentences of the ecclesiastical courts,
for *cuilibet in sua arte perito est credendum ;* and that,
if the ecclesiastical judge showeth cause of his sen-
tence, yet, forasmuch as he is judge of the original
matter, they shall never examine the cause whether
it be true or not.

‡ 2 *Lev.* 14.  1
*Freeman,* 83.
*Carth.* 225.  1
*Salk.* 290. *Skin.*
493.   *Str.* 960.
961. *Amb.* 761.
*Harg. Law
Tracts,* from
452 to 479.
§ *Harg* 457.
471. *Bul. N. P.*
245.
* 4 *Co* 29 *a.*
†*Str.* 691. 3.*Bro.*
*P C.* 62. *S. C.*

‡ *Str* 690.
*Amb.* 763.

All the subsequent cases say the same thing.‡

This conclusive effect of the sentences of the spi-
ritual courts applies to *strangers* as well as to parties
and privies.   They are conclusive evidence of the
fact against all the world.§   In one of the cases from
*Coke,*\* and in the case of *Hatfield* and *Hatfield,*†
which was finally determined on appeal in the house
of lords, in 1725, the sentence was held binding on
strangers.      In a case before lord *Hardwicke,* and in
a case before chief justice *Willes,*‡ strang ers were

allowed to use the sentence against those who were parties.

The same doctrine is established in respect to condemnations in the exchequer. This fully appears from the case of *Scott* and *Shearman*,\* in which it was held by Mr. Justice *Blackstone*, in a very elaborate argument, and in which all the court concurred, that the condemnation in the exchequer was conclusive ; not only *in rem* but *in personam* ; not only in the property vested in the crown, but as to every other collateral remedy ; not only as to the party to the suit but as to the right owner, although no party, and against all the world. The seizure itself was held to be notice to the owner.† The law gives implicit credit to the judgments of competent courts, and it was afterwards observed by chief justice *De Grey*, that the decision in that cause had been the uniform law for above a century.‡

It seems to be every where taken for granted, that the sentences of admiralty courts are equally final.§

The rule, then, I have mentioned in respect to domestic judgments, has received all the sanction that a continued train of decisions can possibly give it.

We are next to see whether the same rule, as appearing to be directed by the same reason, has not been applied with equal uniformity to foreign judgments.

The most ancient case to be met with in the English books, is the case of *Hughes* and *Cornelius*.\*— Although the special verdict in that case falsified the sentence of condemnation in the French admiralty, yet the court admitted the sentence to be true ; and although the suit was trover, in which, nothing but

ALBANY.
Vandenheuvel
v.
United Insur. Company.

\* 2 *Black. Rep.* 977.

† This law, as to *notice*, confirmed,4 *Durnf.* 191.

‡ 2 *Black. Rep* 1176.

§ 1 *Show.* 6. 3 *Mod* 195—*note.* *Harg.* 467. 2 *Ld. Raym.* 893. 1 *do.* 724. *Comyn's Dig. tit. Admiralty*, E. 17.

\* *Raym.* 473. 2 *Show.* 242. *Skinner*, 59. S.C.

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

the direct effect of the sentence came necessarily in-
to view, yet the court, in giving judgment, laid down,
this general doctrine, applicable equally to collateral
effects, viz. That they ought to give credit to fo-
reign sentences of admiralty, and take them to be
according to right, and not to examine their proceed-
ings; that this was agreeable to the *law of nations,*
and sentences in courts of admiralty ought to bind
generally according to that law; that if the party
was aggrieved he ought to petition the king, it being
a matter of government, and if there appear cause,
he will instruct his liege ambassador, and on failure
of redress, will grant letters of reprisal.

This decision, and the principle contained in the
judgment, were afterwards cited and sanctioned by
lord *Holt,* and again by lord *Hardwicke,* and lastly,
by professor *Wooddeson,* in the course of his Vine-
rian lectures.*

* *Carth.* 32.
1 *Atk.* 49.   2
*Woodd.* 456.

A similar doctrine has been repeatedly advanced,
and, whenever the occasion arose. Instances of this
are to be met with in the successive decisions of
the chancellors *Nottingham, King* and *Hardwicke.*†

† 1 *Vern.* 21.
2 *Str.* 733.
1 *Vezey,* 159.
‡*Ridgeway,*266,
267.

In the case of *Gage* and *Bulkeley,*‡ before lord
*Hardwicke,* Sir *D. Ryder,* who was then attorney-
general, laid down the rule in its fullest latitude, and
as being well established. He said that foreign
judgments were received in *England* as conclusive
evidence, and had the same regard paid to them, for
the sake of justice and public convenience, as sen-
tences given in the courts of admiralty or ecclesias-
tical courts at home; and he cited the case of *Ham-
den* and *The East-India Company,* which was deter-
mined upon appeal in the house of lords, and on the

ground, that the sentence of a Dutch admiralty was conclusive evidence, it being *res judicata*, and could not be unravelled or re-examined. Although what he said was merely *arguendo*, yet, coming from such an eminent counsel, and appearing to be taken for granted by the court, it is pretty good evidence of the prevailing sense on the subject.

Here we may also notice the answer of the judges (of which Sir *D. Ryder* was one) to the Prussian memorial, as being a document of very high authority, and bearing on the question before us.* It is there stated, that prize-courts are by the maritime law of nations; that in every country there is a court of review, to which the parties who think themselves aggrieved, may appeal; that if no appeal be offered, it is an acknowledgment of the justice of the sentence by the parties themselves, and is conclusive; that captures have been immemorially judged of in that way in every country of *Europe*, and with the approbation of the powers at peace; that every other method of trial would be impracticable and unjust, and that, if prize-courts proceed contrary to the law of nations, and treaties *in re minime dubia*, then, and not till then, the neutral has a right to complain.

This answer, and the principle contained in the case of *Hughes* and *Cornelius*, may be considered as a correct commentary on the law of nations, relative to the effect which judicial sentences in one country are to receive in the courts of another.†

After such a repeated and general recognition of the principle, we are prepared to expect an application of it (for that is all that is now wanted) to the case precisely the same with the one before the court.

*Margin notes:*

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

* 1 *Col. Juric.* 101, 102, 106.

† *Grotius, l.* 3. *c.* 2. *sec.* 5. *Vatt. l.* 2. *sec.* 84, 85. *Martens,* 104. 105. *Erskine's Institutes, vol* 2. 735.

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

* P. 244.

† P. 37. This
book was pub-
lished in 1761.

‡ Doug. 575.

We do, accordingly, find it stated as law, in *Buller's Nisi Prius*,* that in an action upon a policy of insurance, with a warranty that the ship was *Swedish*, the sentence of a *French* admiralty court, condemning the ship as *English* property, was held conclusive evidence. The same case was previously stated in the *Theory of Evidence*,† to have been decided, and *Park* gives us a particular report of another decision of the like kind, before lord *Mansfield*, at the sittings after *Hilary Term*, 4 Geo. III. in the case of *Fernandez* and *Da Costa*. A ship was insured, and warranted a *Portuguese*; she was libelled and condemned in a *French* court as not being *Portuguese*, and although the plaintiff gave partial evidence of her being *Portuguese*, yet, when the defendant produced the sentence, it concluded the cause.

Where, then, can we discover a doubt, as to what was the law at the time of our revolution? Upon what ground can we pause even to raise a conjecture, that the court of King's Bench, in the case of *Bernardi* and *Motteux*,‡ (being the first cause after the year 1776) created a new rule, when even the counsel for the plaintiff, at the very outset of the argument, admitted, that if the sentence of the *French* admiralty had proceeded on the ground of the property not being neutral, the plaintiff would have been concluded.

Nor do I think the *English* decisions, since the year 1776, are to be thrown *wholly* out of view, although they are confessedly of no binding authority.

In addition to the consideration of the well known character of their judges, we are to observe that their

tribunals and ours, study and pursue the same code of law and of equity, and that they are certainly not more liable than we ourselves, to misapprehend the authentic records and oracles of the common law.—— If the question, therefore, were otherwise involved *in doubt*, a series of uniform decisions in the *English* courts, for the last twenty years, cannot but be considered, and that, too, without being unduly addicted *jurare in verba magistri*, as a very sufficient cause to remove it.*

Having thus ascertained, at least to my satisfaction, that by the law, as it stood in 1776, a sentence of condemnation abroad, on the direct point in question, is, in a collateral suit by the insurer, conclusive evidence of a breach of his warranty, so that no evidence can be admitted to impeach it, I have done all that I undertook to do. I might here rest the argument. Whatever opinion may be entertained, as to the justice or policy of the rule, is not to the purpose. Our duty is *jus dicere, non jus dare*. I may be mistaken, but it appears, however, to me, that all the reasons which have established the rule relative to domestic courts, having exclusive jurisdiction of a subject, apply with *peculiar force* to a case like the present.

Courts of law are inadequate to determine the question of prize, and to overhaul the sentence is in reality trying that question. The circumstances that go to constitute prize, are oftentimes complex.—— The property may be deeply masked, the papers double, or every requisite paper may be regular, and yet the conduct of the master such as to cause the property to *lose* its privilege of neutrality. None but

L 1

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

* *Doug.* 575. 610. 614 to 617. 705. *Barzillay* v. *Lewis*, *De Souza* v. *Ewer*, and *Saloucci* v. *Woodmason*, cited by *Park*—7 *Durnf.* 523,681, 705. 8 *Durnf.* 196, 232.

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

* 8 Durnf. 234, 444.—A *warranty* of neutrality, means that the ship shall maintain a neutral conduct and not forfeit it during the voyage.

a court clothed with the mode of proof, the summary powers, the enlarged discretion of a prize-court, can seize, and sift every circumstance. The maritime law of Europe, has, therefore, very wisely established a peculiar court, for the exclusive jurisdiction of prize. It is there that the assured should vindicate his property, and if aggrieved, he should carry his appeal to a court of review. There is great weight in the observation, that this is the true construction of the engagement, on the part of the assured. By representing, or warranting his property to be neutral, the assured undertakes, not only that it is so in *fact*, but that it shall be *entitled* to neutral privilege, *throughout the voyage.** To construe the engagement to be *less* than that, is in a great degree, to render it idle and nugatory. " To implement this warranty," says a very sensible writer on insurance, (*Millar*, p. 496.) " the ship or goods must be neutral *in conception of that nation from whom danger of seizure is apprehended.*" On such a representation or warranty, the insurer lays out of view the risk of loss, by reason of the non-neutrality of the property. That risk the assured takes upon himself, and having in his hands, exclusively, all the *means* to do it, he is bound to make good his *averment*, whenever, and wherever the neutrality of the property, or its privilege as such, is called in question. If he fails to do it, he must bear the loss, and if foreign sentences were liable to be re-examined here, I should still incline to think, that in the case of an *express warranty*, the assured, and not the insurer, takes upon him the risk of the condemnation, *right or wrong.* Whether that would or would not be the

case, on a *representation* merely, I am not as yet prepared to say, and therefore, in those suits, where there was no warranty, but only a representation, I should choose to rest my opinion, entirely on the first ground, of the faith due to the foreign sentence.

The result of my opinion, accordingly, is, that the plaintiff is not entitled to recover in this cause, beyond the return of his premium.

On the judgment rendered in conformity to the foregoing opinions, the now plaintiff *Vandenheuvel* brought his writ of error, insisting that the judgment was erroneous——

1. Because there was no warranty in the policy, and, therefore, the defendant assumed every possible risk.

2. Because the order for insurance, if it amounted to a representation, must have been understood by both parties merely as a representation that the property belonged to the plaintiff, not that it was neutral or *American.*

3. Because the sentence of condemnation does not negative the representation : And,

4. Because, if the representation amounted to an explicit warranty of the neutrality of the property, the jury have found it to be true, and the sentence ought not to be received as evidence to the contrary.

1. We say, there being no warranty in the policy, the underwriter took upon himself every hazard, and particularly those arising from the character and quality of the property.

The policy on record contains nothing like a warranty of any kind. Mr. *Vandenheuvel* is not stiled a

citizen of the *United States*—nor is there an expres-
sion in it which can be tortured into an intimation of
the country or community to which he belonged; he
had no doubt heard, how extremely jealous our courts
were of foreigners assuming the name of *American ;*
he also knew, probably by woful experience, that
many of the *West-India* judges, those oracles of
modern law, were also of opinion that a *Dutchman*
had no right to expatriate even for the purposes of
commerce ; it may likewise have come to his ears,
although he must have been endued with more than
common intellect to comprehend its meaning, that a
foreign sentence, silent as the tomb, would proclaim
in loud, unequivocal and conclusive terms, that *he was
no American.* With all this information, well calcula-
ted to inspire apprehension and caution, he makes the
present insurance. For a moment, he is tempted to
save a part of the premium, and warrant his property
neutral : He has resided in *New-York* more than five
years—his certificate of naturalization bears testi-
mony of his citizenship—the property he knows to
be his own, and he is on the point of calling it *Ameri-
can* in the policy. This was true, and would have
reduced the premium considerably : But, on further
deliberation, he resolves to forego every benefit which
his naturalization and neutral character give him, and
to pay a war-premium without the embarrassment of
a warranty. The policy is framed accordingly ; not a
letter in it purports a warranty of any kind. Was
the instrument then to be our guide, as it ought to
be, we should arrive at a correct decision without
difficulty, and without opposition from a sentence
more impregnable, if possible, than the invincible
fortress whence it issued.

The policy being for the benefit of every one to whom *the property may appertain,* would cover not only his own goods but even those of a belligerent merchant : " These words," says the learned *Emerigon,* " comprehend *Frenchmen,* as well as neutrals. The expression is general, and such should be its interpretation, especially in the present state of affairs, (*France* being then at war) when it is clear that if the insurance had been intended for a neutral, it would have been so declared in *express terms*—the assurers, therefore, he continues, have no pretext for saying they were deceived."—*Val. Ord. Mar. 2 vol. p.* 120. The underwriters, in the case *Emerigon* is speaking of, complained that they had not been apprized of the property belonging in part to *Frenchmen.* This author, not less celebrated for a pure and unblemished life, than for his professional labours and skill, evidently supposes no property in time of war should be deemed *neutral* unless *expressly so* stated in the policy. Some judges in this country have intimated an opinion, that all property in time of war must be taken as belonging to neutrals, unless otherwise called in the policy. Should this case come to the hands of any gentlemen who have fallen into this error, the mischiefs of which to our merchants surpass calculation, I beg them to peruse the author just cited—if his arguments, in which the vigor of a great mind, and the perspicuity of a man who fully understands himself, ever appear, are not followed by conviction, nothing I can say will be attended to. Mr. *Vandenheuvel,* neutral as he was, did not think it safe to pursue the advice of this great man, and describe himself and property as such. Whatever rights neutrals have had and maintained, Mr. *Van-*

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

*denheuvel* knew, that at this day, every such preten-
sion is abandoned, and that citizens of this descrip-
tion are given up by the courts of their own nation to
be buffeted and plundered by the worse than inquisi-
torial tribunals of the powers at war : In the same
case it is mentioned that underwriters are bound to
pay for an *unjust* capture ; this is common sense, and
therefore we must not be surprised to find that it was
law in the days of *Emerigon*.  But the plaintiff re-
collected, that in the present day a rage for improve-
ment pervades every rank in society ; that not only
philosophers, but ministers of justice, were infected
with the pernicious mania ; that judges in *England*,
with not more learning or industry than their prede-
cessors, were innovating on their venerable institu-
tions.  He feared, perhaps, that the same spirit of
refinement might extend to this side of the Atlantic :
to be safe therefore in every possible event, he effects
an open policy, unfettered with any warranty, stipu-
lation or condition whatever.  But even the caution
and sagacity of a *Dutchman* cannot secure him :—
He unfortunately writes a letter, and although this
forms no part of the contract, it is now produced in
judgment against him : this weapon shall also be
wrested from the hand of his adversary, and employed
in his defence.  If the policy contains not internal and
satisfactory evidence, that no neutrality was to be war-
ranted, such intention results most irresistibly from
this very letter, or order for insurance :  This we say,

2. Amounted only to a representation that the
property *belonged to Mr. Vandenheuvel*, not that it
was *American*.

1. From the express terms of the order.

2. From the course of the transaction.

The distinction here relied on between calling the property *his own*, and calling it *American*, is impor- tant, in case this abominably wicked *Gibraltar* sentence is to be enforced against him. He will therefore be permitted to shew not only that a distinction exists, but was intended and understood.

The representation is that the premises insured were the *property of John C. Vandenheuvel.* This, say the underwriters, and the Supreme Court, is equivalent to calling the property *American.* Whence is this inference drawn ? Not from the name; this is most unequivocally *Dutch ;* not from the place of his nativity ; this it is admitted, was in the *United Netherlands ;* nor from his looks, every underwriter at first sight would pronounce him a foreigner ; nor from his speech, for although he speaks *English* very well, the accent of his mother country is perceptible in every sentence ; *nor* could it be presumed from his residence in *New-York ;* this the Supreme Court have said in the case of *Campagne* v. *Deyne*, is not worth a rush. Still less was it to be collected from his naturalization ; this Judge *Kellsall* has pronounced, in the case of poor *Duguet*, (and his sentence has also been affirmed) a sin against his natural allegiance, and a violation of the rights of the belligerent parties. The truth is, Mr. *Vandenheuvel* did not choose to say whether he was a subject of the emperor of *Morocco*, a citizen of the *Batavian* republic, or a sachem of the *Tuscarora* tribe of *Indians.* This they were to guess at as well as they could. He knew that foreign admiralties were in the habit of metamorphosing the national character of a merchant *ad libitum ;* but he had never heard of their undertaking to change the name of an owner. He was not afraid, therefore, of their

saying, that the property did not belong to *him*. To this he knew the papers and testimony would give the lie direct. He only apprehended their calling him a *Spaniard*, a *Dutchman* or a *Turk*, as the interest of the moment might dictate. He therefore contented himself with saying that the cargo belonged to *himself*. The light in which he might be received abroad, was left at the risk of the underwriters. It requires uncommon ingenuity, according to *our* doctrine, (for in respect to naturalized or resident citizens, the *English* courts are infinitely more liberal than the Supreme Court) to ascertain Mr. *Vandenheuvel's* national character. His ancestors must have been subjects to *Philip* king of *Spain*. Those who maintain the divine and hereditary right of kings, and the perpetual and indefeasible obligation of natural allegiance, may stile his ancestors rebels and himself a *Spaniard*; others may call him a *Dutchman*, because he was born a subject of the Prince of *Orange*, or as the Stadtholder has expatriated, (which by the bye, he had no right to do, according to the modern law of nations) they may think him a citizen of the *Batavian* republic. Others, again, considering his oath of allegiance to this country, his residence and naturalization, may be disposed to think, in opposition to the Supreme Court, that he is really and truly, a citizen of the *United States*. This, it must be confessed, is a knotty point and must be left *exclusively* to the decision of an admiralty judge. But with such various pretensions why should the underwriters take him for an *American*? They had no more right, from what passed, to consider him a citizen of this country, than Judge *Morrison* had to pronounce him a *Spaniard*.

3. From the nature of the transaction.

During a war, underwriters ever distinguish between enemy and neutral property : For the former they have a higher premium, and the policy is against all risks. In the latter case, as the premium is much lower, they take care to have the neutrality of the property stated in the policy. When this is omitted, the presumption is fair, that they regard the property as *enemy,* and receive a premium accordingly. Not an instance has occurred this war, wherein an underwriter meant to insure neutral property, *as such,* without its being expressly so declared in the policy. If, in this instance, the contract had been intended to be of that kind, most certainly they would have taken care the policy should speak for itself. They would not have trusted to a slip of paper, which, by the negligence of a broker, or other casualty, might be lost or destroyed.

Again, great injustice will be done to Mr. *Vandenheuvel* by the construction attempted to be put on this contract. It is become a general practice with merchants, who warrant their property neutral, to provide, by a proper clause, that a foreign sentence, shall not preclude other proof. This would have been done here, if either party had supposed the goods *American.* From this benefit, the plaintiff will be precluded, and that by the negligence of the defendant, who should have insisted on this stipulation, if he intended, at a future day, to avail himself of it. His not making this a part of the contract is a clear proof that he did not underwrite the property as neutral, and received a premium accordingly.

If our interpretation of the order, which leaves no room for construction, be just, it follows—

M m

4. That the sentence of condemnation is not at variance with the representation.

" The property is condemned as belonging to *Spain*, or to persons being subjects of the king of *Spain*, or inhabiting within the territories of the king of *Spain*, enemies to the king of *Great-Britain*."

Mr. *Vandenheuvel* has not said he was not a subject of the king of *Spain* ; a person may, by swearing allegiance to different sovereigns, become the subject of several countries. We have many *British* subjects among us who are *American* citizens, but who would be treated as traitors by the mother country, if taken in arms against it. So that, for aught that appears, the plaintiff may have sworn allegiance to the king of *Spain*, and yet the property may fall within the letter of his representation, which only declares it to be his own. It is admitted he was born in *Holland*, and the *British* courts of admiralty, if they govern themselves by the decisions of our supreme court, would have confiscated it, although he had produced his letter of naturalization. It was, no doubt, to guard against this very event, that he cautiously avoided declaring to what country he belonged. He knew he was an *American* citizen, but he could not tell that foreign courts would consider him as such.

The cargo was too valuable, not to have brought his case within some of the new-fangled principles, which have lately been adopted to reach neutral property. He knew, also, that by the law of nations, and by that of *England*, he was entitled, for every purpose of trade, to be regarded as an *American* ; but he as well knew, that boards of admiralty re-

spected no law. He was determined, therefore, not to expose himself to any embarrassment that might arise from the iniquity of their proceedings, or to put it in the power of the underwriters to avail themselves of any sentence they might pronounce. He could not, however, foresee the length which the supreme court would go in giving effect to such sentence. He little imagined, that presumption on presumption would be raised to defeat his recovery.

1st. It is presumed that he is an *American* citizen. This is in direct contradiction to the decision in the case of *Duguet.* Then it is presumed he meant to warrant the property *American,* although nothing of the kind appears in the policy. Next, it is presumed he meant to represent it as such, although the order for insurance conveys a meaning totally different. Then it is presumed, the property was not *American;* because, the judge, appointed specially for the purpose of condemning neutral property, has said it belonged to *Spanish* subjects.— Lastly, it is presumed not to belong to Mr. *Vandenheuvel,* although his name does not appear in the decree. There must be some uncommon sanctity in these decrees, where so much pains, and such forced constructions, are resorted to for their support.

But if all these presumptions must be made in a case where every honest feeling must take part with the assured, we say—

5. That the jury having, by their verdict, verified the truth of his representation, the sentence cannot be received as evidence to the contrary.

That a sentence abroad, ought, in no instance, to conclude the assured, was shown in the case of *Goix*

v. *Low*, which is now before this court.   Referring to that argument, we shall only insist, that there is a real and acknowledged distinction between a representation and a warranty ; and that among all the unintelligible and contradictory *British* cases, *not a single* decision is to be found, in which this outrageous principle has been applied to the case of a representation.

If such sentences are conclusive against one representation, why not against another ?   In that case. where are we to stop ?   Representations are infinitely more diversified than warranties.   One man in his instructions to insure, calls his vessel a *ship*—she is condemned, because she is a *brig*.   Another says, the crew are all *New-Yorkers*—she is sentenced, because one of them *was born in Boston*.   A third says his vessel is an unarmed merchantmen—she, too, falls a prey ;  and without a particle of proof, it is stated by his honour, that she was armed with thirty-six guns, *all twenty-four pounders*.   This, too, must be conclusive ;  for, although the vessel insured, should appear to be an *Albany* sloop of only fifty tons, our courts would be compelled to believe, that by some miracle, she had strength enough to carry guns of that caliber, and would think it very disrespectful in the owner, to hint at the impossibility of the thing.

A merchant will soon find it difficult to write an order for insurance—he will hardly dare to open his lips.   If he tells the truth, and has a hundred witnesses to attest to it, it may, by and bye, be contradicted by a judge, of whose existence he had never heard, or who may be one of the herd that infest

the *West-India* islands.   He will be compelled to be
silent, or the most he will dare to say to the broker
will be, " tell the assurers the name of the vessel,
and the voyage ; pay whatever premium they ask ;
answer no questions.   Say not that the vessel is
painted white or black ; that she has two or three
masts ; that she is armed or unarmed.   If they sus-
pect the property belongs to the *French* Consul or the
Grand Seignor, and therefore demand a higher pre-
mium, do not undeceive them ; pay at once the ad-
ditional sum they ask.   I know I am a native *Ameri-
can*, and that the property is mine ; but rather than
give a hint of the kind, which will be twisted into a
warranty or representation, I will submit to pay five
or six thousand dollars more and have no trouble
about it."

.  Thus will every *American* be driven to the neces-
sity of carrying on trade as a belligerent subject, to
avoid becoming a victim of the fascinating doctrine,
that admiralty judges can do no wrong ; and that
their righteous decrees are to bind all mankind, from
the rising of the sun to where he goeth down.   The
decisions of *Sancho*, while governor of *Baratraria*,
notwithstanding the sagacity which the squire dis-
covered, and the high reputation in which they have
hitherto been held, must now, like every thing hu-
man, pass away.   His judgments were the result of
common sense and common honesty, (for luckily for
his subjects, he knew nothing of the law of nations)
but they bound only the inhabitants of a small island :
the *West-India* sentences, on the contrary, pervade
the globe, and proceed on the eternal and immutable
laws of God and of nature, which no earthly conside-

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

ration would have tempted judge *Morrison* to violate. What a pity 'tis, that his honor did not disclose to us the grounds of condemnation. The truth is, there was found on board a letter in cypher, from the *French* Consul at *New-York :* It was this innocent epistle which occasioned the forfeiture of a most valuable property : And yet this decree, this offspring of darkness and oppression, this outrage on neutral rights, this satire on justice, must be received as conclusive evidence, that the property belonged to the king of *Spain*, who, it seems, has lately become a merchant, although the very judge who pronounced it, must have been satisfied, from the documents before him, that the ship and cargo actually and entirely belonged to the plaintiff.

There being neither a warranty, nor representation as to the property's *neutrality* in this case, it must be superfluous minutely to examine how a foreign sentence should be treated in this country. I shall therefore only subjoin a summary of the reasons why, even in case of express warranty, a sentence should be conclusive of nothing, except that the property was actually condemned, and that therefore, the assured was entitled to recover.

1. It is contrary to the written contract, and the true understanding of the parties. The high premium paid by neutrals during a war, is to be protected against *unjust judgments*. It is not within human ingenuity to assign another plausible reason, why neutral property should, in a war between other powers, be burthened with so great an addition of premium. Is it not then absurd and unjust to say, that by such a sentence, *the risk*, which was so much apprehended,

and the *principal* one intended to be guarded against, shall bar a recovery ? Not all the art of man, nor powers of the human mind, can reconcile this plain, obvious, and true construction of the instrument, with the doctrine of a foreign sentence being conclusive.

2. It is a capture at sea which gives to the assured a right to abandon. This being made, fixes the condition of the parties. A subsequent judgment cannot alter or vary their rights. " If an abandonment be made, the *assurers*" says *Emerigon*, "are *alone* interested in the sentence which may be pronounced ; and if the ship be declared good prize, contrary to the law of nations, or the laws of war, the underwriters must suffer by it. If the property be released, it belongs to them in virtue of the abandonment. But what fixes," says he, "the condition of the parties, considered in itself, is *not the judgment rendered by the tribunal* of a *foreign* and *hostile monarch.* It is the *abandonment,* made or not made ; it is the *capture,* that confers the *right* of abandoning." *See Valin, vol. 2. p.* 122.

Here, in few words, without any affectation or display of learning, we have a just and correct construction of an important expression in the policy, a want of attention to which has occasioned all the confusion and absurdity of modern adjudications. It had not occurred to this profound lawyer, how an unjust sentence, which must necessarily be subsequent to a capture, could defeat the rights of the assured, which that event, followed by a timely abandonment, had rendered perfect and indefeasible : Nor could his penetrating mind discover, how any question, arising

on a policy, could be influenced by proceedings which were carrying on, *in rem,* at many thousand leagues distance, and in the absence of all the parties : Still less could he perceive why the tribunals of his own country should forbear to inquire into the truth of a fact, which had probably never been agitated abroad. But no study or reflection could have brought him to comprehend why a court in *France* should not decide according to *facts admitted by both parties,* (as is the case here) merely because a foreign tribunal had condemned the property as prize : He therefore consi. dered the vessel, after capture and abandonment, lying entirely at the risk of the underwriters, and that the consequences of a condemnation, just or unjust, must be borne by them. This, however, did not deprive the underwriters of any defence arising out of the peculiar quality of the property, or the misconduct, or misrepresentation of the assurers. Such questions frequently must have arisen : when they did, they were decided according to evidence, as in other cases, by the *French* courts, who saw no reasons for transferring to a petty tribunal, in the east or west, matters which they themselves were competent to determine, and respecting which they possessed full and complete information. Under this order of things, the assured contended on equal ground with his adversary : his witnesses were heard, his papers examined, and his character and reputation were not totally lost sight of. Under the new state of things, his reputation, his witnesses, the fairness of his conduct, and regularity of his papers, avail him nought : In short, he has no more chance of succeeding against an underwriter, who is protected by an unjust

foreign sentence, than the property itself, perhaps a valuable Indiaman, had of being released from the gripe of a corrupt and rapacious admiralty judge.

3. If these sentences are received as conclusive, great injustice will most certainly, and invariably follow; which will be avoided, by permitting the assured to prove his warranty. This argument should exclude the reception of these sentences : by doing so, injustice may be done; in the other way, an improper decision is impossible.

4. These courts being governed, not by the law of nations or of war, but by arbitrary mandates of their respective sovereigns, it is folly in the extreme, to pay any deference to their decrees.

5. If they were truly governed by general, fixed and known rules, their modes of proceeding, are too unfriendly to truth, to receive their sentences, as evidence of any fact whatever.

6. It is extremely difficult, and so allowed to be on all hands, even when the cause of condemnation appears, which is not often, to discover by what rule the judge has come to his conclusion; it is, therefore, not just to say, it *must have been* for this or the other reason.

7. It is impolitic to give any credence whatever, to these decrees, except when it is attempted to disturb their *direct effects*.

8. By admitting the assured to prove his warranty, these sentences are neither opened or reviewed; a contrary supposition has been the source of much error on this subject.

Upon the whole, a case more to be favoured, never presented itself to a court; the plaintiff has

N n

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

acted with good faith throughout ; if he has really made any representation, as to the neutrality of his property, which he denies, the defendants admit he has said no more than what is true.    He sees no reason, therefore, why he should not' entertain sanguine hopes that this judgment will be reversed, and the underwriters compelled to pay the whole amount of their respective subscriptions.

BROCKHOLST LIVINGSTON,
*of counsel for the plaintiff in error.*

The defendants in error insisted that the judgment ought to be affirmed, because,

1.   The description of the good *American* ship is equivalent to a warranty of her as *American* property, by the plaintiff in error.

2. Because every warranty in a policy is deemed to be a condition that a certain thing shall be performed, and unless it be performed the contract is void.    It is perfectly immaterial with what view the warranty is inserted ; or whether it is inserted with any view at all ; but being once inserted it becomes a binding condition on the assured ; and unless he can show that he has literally fulfilled it, the contract is the same as if it had never existed.

3. Because the sentence of the court of vice-admiralty, condemning the ship and her cargo as *Spanish* property, without assigning any reasons for the condemnation, is conclusive evidence that the ship was not *American* property.    Hence it follows that the plaintiff in error has failed in performing his warranty that the ship was *American* property, and consequently the plaintiff in error cannot be entitled to

recover a total loss ; but is only entitled to recover a return of premium.

ROBERT TROUP,
*of counsel for the defendants.*

On the cause being brought on, RADCLIFF and KENT, justices, assigned the reasons of the court, as ante, from page 243 to 267 inclusive.

CLINTON, Senator. The plaintiff having warranted a ship and cargo as *American* property, the question is, whether, in an action against the insurers, the sentence of a foreign court of admiralty, that such warranty was false, is conclusive evidence. It is admitted by the plaintiff, that the sentence binds and changes the property, and that it is *prima facie* evidence of the fact set up against him ; and on the other hand, it is conceded by the defendants, that in several cases, in an action of this kind, the judgment is not definitive in favour of the insurers; such as when, on the face of it, it is founded on local ordinances, or contrary to the law of nations, or so ambiguous that the court cannot, from the reasons assigned, collect the grounds of it; and, that this case not coming within either of these descriptions, the contest between the parties still remains open, whether the foreign sentence be *prima facie* or conclusive evidence, against the insured, and whether it bind the property adjudicated only, or is conclusive to every extent, and in every modification of the subject.

Upon a question of such immense importance, either as it respects the interests of commerce, the honour of the nation, the rights of individuals, or the principles of justice, great and mature deliberation is requisite and essential. I know not any cause

that has ever been discussed in this court, which embraces so many objects, to render the final result important. Attempts have been made, to establish the doctrine of conclusiveness ; and, as far as I can comprehend them, they may be arranged under four general heads.

1st. Authorities, previous to the 19th *April*, 1775.

2d. Analogical reasoning from domestic courts.

3d. The nature and meaning of the contract of insurance ; and,

4th. National considerations of courtesy, comity, and the like.

The cases quoted, as existing anterior to the revolution, are not only few, but are either ambiguous or not in point.

The most ancient one, reported in 2 *Shower*, of *Hughes* v. *Cornelius*, was an action of trover, brought for a ship sold under a decree of a *French* admiralty court. The court admitted the sentence to be true, although contrary to the special verdict. They went upon the ground of the decree's changing the property, and of the inconveniences that would result to merchants, if the court should unravel the title of property acquired in this way ; and the reason assigned by chief justice *M'Kean*, in a case reported in *Dallas*, seems to be conclusive ; the idea that a sentence of a court of admiralty is conclusive, arises from this consideration, that the court always proceeds *in rem*. The decree naturally and necessarily binds the subject of the proceeding. A ship or cargo, or any person purchasing under the decree, will, of course, be secure.

- The next case relied upon, is a supposed one of

a *Swedish* ship. It was first mentioned by an anony-
mous author, in a book entitled " *Theory of Evi-*
*dence*." It does not appear in any collection of re-
ports ; and *Buller*, in referring to his authority for
this, mentions in the margin, the case in *Shower*.
It therefore appears, that it is confounded with the
case of the *Dutch* ship in that author.

The case of *Fernandez* and *Da Costa*, was a *Nisi*
*Prius* one, and it expressly states, that the plaintiff
only gave a partial evidence of the vessel's being
*Portuguese ;* and all we can collect from it, is, that
the testimony adduced by him was not sufficient to
balance that derived from the foreign adjudication.
Will it be believed, that upon this slender ground,
the mighty fabric of conclusiveness is attempted to
be erected ? For, independent of decisions since
the revolution, which are no authority ; of arguments
from analogy, which I shall presently notice ; and of
a few scattered dicta in the books, which do not bear
the stamp of judicial authority; there is nothing
whereby to warrant the decision of the court below.

The arguments derived from the deference which
is paid by the courts of *England* to each others pro-
ceedings, do not apply. They are parts of the same
building, held together by one common arch. They
are under the same government, proceed according
to the same law, and redress can be obtained through
higher tribunals. If they attempt to exceed their
jurisdiction they can be restrained by a superior
power, which has an interest in preventing any un-
due encroachments, and repressing any improper
deviations. This is not the case with a foreign court
of admiralty. If a neutral conceives himself injur-
ed, and is indulged with an appeal, he must still con-

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

tinue in the courts of the belligerent ; and there is not any uniform law by which these courts govern themselves. They listen more to instructions from the sovereign, than to the injunctions of the law of nations. Lord *Mansfield* admits, that "in every war, the belligerent powers make particular regulations for themselves ; and that no nation is obliged to be bound by them. (*Park*, 360.) It is conceded by the defendants that a foreign sentence is not binding if resting, on the face of it, on such regulations, and yet they declare, that if founded on these, but it does not appear to be so founded, that then it is conclusive.

With respect to the nature of the contract, upon which much has been said, I confess I do not perceive the force of the reasoning, which attempts to fix the loss on the insured.

The contract of insurance, says *Park*, being for the benefit of the insured, and the advancement of trade, must be construed liberally, for the attainment of those ends. We must, therefore, not give it an exposition that would tend to embarrass commerce, or injure the assured ; but adopt such a construction as will most promote the important objects in view. How commerce would be affected, shall hereafter be considered. By the terms of the contract, the assured warrants the property to be neutral, and it is understood to be incumbent on him, so to conduct the vessel, as not to forfeit her neutrality. If the vessel be neutral, in fact, he fulfils his warranty.— He does not warrant that she shall be so in the conception of foreign courts. It is not in the reach of human sagacity, to scan the views which different men may take of the same subject, or the various motives which may produce clashing decisions.—

Against corruption or ignorance in judges, perjury in witnesses, and fraud in captors, it is out of the power of the assured to guard ; they are risks which he casts upon the assurer, and which the assurer undertakes, in consideration of an adequate premium. All the assured is required to do, is not to falsify his warranty. In this case he paid a war-premium of 15 per cent ; and, the foreign sentence out of view, the special verdict has verified his warranty.

With regard to the comity due from one national tribunal to another, it appears to me that the compliment is carried sufficiently far, by considering the sentence as *prima facie* evidence. We are not bound to sacrifice the substantial interests of our citizens to etiquette or courtesy. If a foreign nation will countenance unjust spoliations, if a foreign judge will divide the spoil with the plunderer, are we to countenance the knave and the robber, and declare, with all possible politeness, although we are convinced that an inquiry would paint you in these colours, yet, our respect for your authority will prevail over a regard for justice, or the claims of our citizens; we shall silence all discussion ; and, although we know you to be both ignorant and corrupt, both oppressive and fraudulent, yet, as you wear the form, without attending to the obligations of a court of justice, we shall treat your decisions with all imaginable courtesy, comity, deference, politeness, and respect.

This is a summary of the doctrine, stripped of the imposing garb which it has assumed, and it can only be a question, whether it is most deserving of ridicule, or detestation.

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

In suits, brought in *England*, upon foreign judg-. ments, between the same parties, the courts consi- der them only as *prima facie* evidence of the demand, and admit the defendant on a plea of *nil debet*, to contest the merits of the original cause of action.— If a foreign judgment be not considered conclusive between the same parties, in cases of this nature, why of a foreign court of admiralty between third persons ? The constitution of the *United States* provides, ·that " full faith and credit shall be given in each state, to the public acts, records, and judicial proceedings, of every other state." And the Con- gress may, by general laws, prescribe the manner in which such acts, records, and proceedings, shall be proved, and the effect thereof. Is it conceivable, that if the sentence of courts of disconnected nations are to be held in such high veneration, by each other, that the framers of the constitution could have thought it necessary to make this provision for sister states, in the closest bond of political connexion.— The *British* have made the interests of commerce a primary object of their cares. In the discovery and arrangement of wise plans, and the execution of ef- ficacious measures, for the attainment of this impor- tant end, they stand unrivalled in the history of man- kind. Their fleets now traverse every clime, and visit every sea, laden with the riches of the world; they bear in their hands the trident of the ocean. In the time of ·war, they enrich themselves with the plunder of neutrals ; their courts appear every where, and condemnations are conducted, not ac- cording to the law of nations, or the rights of parties, but according to the instructions from the sovereign

and the rapacity of the captors.  " Much less," says
*Wooddeson*, " ought any of our courts to slight a fo-  Vandenheuvel
reign sentence.  Unless we give credit to their pro-  United  Insur.
ceedings, we cannot expect the judgments here,  Company.
should be thought to merit from them any reverence
or attention."  Here, then, is an explicit avowal that
the doctrine is adopted with a view to a return.  But
*France*, having a different policy, has adopted a dif-
ferent system.\*  It is to be further considered, that  \* *Emerigon*,
*Great-Britain* is more than one-half her time at war ;  admitted in the
that she is an underwriting nation, and, therefore,  argument  of
highly interested in maintaining the rule laid down.  *cliff.*
Our policy is entirely different.  Peace is no less our
interest than our duty.  Our courts are not liable to
executive instructions, and, consequently, must go
by the principles of justice ; not according to the exi-
gencies of the state.  In establishing, therefore, a
rule for our government, on this momentous subject,
*argumenta ab inconvenienti*, ought to have great
weight.  *France* and *England* have set us the exam-
ple ; and, as the law of nations is, at least, doubt-
ful, we are at liberty to adopt such a construction, as
shall most subserve the solid interests of this growing
country.  We ought, also, to consider, that the ob-
ject of insurance is indemnity ; that instead of fixing
the loss upon one, it divides it among many ; that
with a pacific nation like ours, an exposition that
will release the insurer from war-risks, will be a de-
privation of all the benefits that can arise from a neu-
tral position, and will expose us to most of the ca-
lamities without any of the advantages derivable
from a belligerent state.

Even *Great-Britain*, situated as she is, has found
inconvenience, in many respects, from the generality

ALBANY.
Vandenheuvel
v.
United Insur.
Company.

of the rule she has adopted. Her courts have, by recent decisions, attempted to narrow it into a smaller compass. Several important exceptions have been sanctioned, and whenever a different course of policy shall be deemed advisable, the whole system will be destroyed. Our court has, unadvisedly, and in the first instance, without hearing argument, taken that direction, and with the best intentions, has persevered in a doctrine, which would inevitably lead to the spoliation of our citizens, and the destruction of our commerce.

There is nothing, either in the constitution of the admiralty courts of European nations, or the mode of proceeding in them, which entitle them to respect. They adopt the rules of the civil law. The Judges hold their offices during pleasure, and follow the instructions of the ministry. The captors, who are interested, are admitted as witnesses, and the Judges are paid in proportion to the condemnations. They are generally composed of needy adventurers; their great aim is plunder, and their primary incentive, avarice.

I have thus, in a cursory manner, glanced at the principal grounds of reasoning in the cause, and I must own, that I feel most deeply impressed with its importance. The effects of the decisions of this day, will be felt when we are no more; and I trust, that it will receive the approving voice of our consciences, and of our country.

GOLD, Senator.—The questions that arise in this cause for the consideration of the court, are:

1st. Does the warranty in the terms of the *good American ship, the Astrea*, import, in judgment of law, *American or neutral property* ?

2d. Is the sentence of the vice-admiralty of Gib-
raltar *conclusive, and does it repel the verification of*
*warranty here ?*

On the first preliminary question, however loose
and indefinite men are in conversation upon subjects
of this nature, yet when the *occasion* is considered,
the bearing of the *property of the ship* on the pro-
fessed object of the contract; its materiality to the
risk, and consequent propriety of an understanding
on the point; the court must, I apprehend, consider
Mr. *Vandenheuvel* as explaining himself on the
question of property, and under the terms *American
ship*, warranting it *neutral*.

Such, in my apprehension, is the plain, fair and
rational import of the language used by the assured
on this occasion.

On the second question in the cause, involving the
legal effect of the sentences of foreign admiralties,
I enter with much diffidence, and all the solicitude
which its extensive operation upon the fortunes of
our fellow-citizens, and the jurisprudence of our
country, inspires. If our law is settled on this point;
if the question is bound by authority, then law must
have its course, however unpleasant the consequen-
ces, however opposed to the speculation of the most
enlightened statesmen.

For authority on the question, adjudged cases in
that country from whence our jurisprudence is de-
rived antecedently to our revolution, must be resort-
ed to.

The necessary effect of the sentences of foreign
admiralties *in rem*, in changing the property in the
subject matter in case of condemnation, is readily

evinced both in point of reason and authority. To this the case of *Hughes* v. *Cornelius*, 2 *Shower*, 232, strengthened by some other cases, bears strong testimony; in this the jurisdiction of all admiralties, and the peace of all civilized nations, are essentially concerned.

But the reason for extending those sentences beyond the attainments of the above objects, to controul the stipulations of parties in a policy of insurance are not equally cogent; the necessity not equally apparent.

For authority to support this application of admiralty sentences is cited, *Buller's N. P.* 244, *Theory of Evidence*, 37, and the case of *Fernandez* v. *Da Costa, Park*, 177. In the two first books the rule to the above extent is laid down in nearly the same words, in plain and unequivocal terms; but no case is cited in the *Theory of Evidence*, in support of the doctrine, and in *Buller*, the case relied on is that of *Hughes* v. *Cornelius;* which, although containing observations of the court of a very general and unqualified nature, yet, in the point adjudged, does not warrant the rule as there laid down.

The case of *Fernandez* v. *Da Costa* is apposite to the question before the court, and merits all that respect which is due to a *N. P.* decision of one of the greatest judges that ever sat in *Westminster* hall. The name of judge *Buller* must be considered also as adding some authority to the rule by him laid down, though supported by no adjudged case there cited.

No adjudications at bar, no elaborate discussions appear to have taken place on the question. On this foundation, in point of authority, stands the doctrine

contended for by the defendants in error; and we are

now called upon to say, whether the question is so
bound down by authority as to be deemed at rest, and
to repel a consideration of its merits.

After much reflection on the point, in every view I
have been able to place it, I am not satisfied that the
law on the subject was settled at the period of our re-
volution.   In pursuing the history of law principles,
in retracing adjudications, and collecting cases upon
questions long agitated in courts, we find early ca-
ses often overruled ; first opinions disregarded and
reversed, and important questions finally settled in
opposition to greater authority of precedent, than
what is to be found on the question before the court.

Such is the result presented by a perusal of *English*
reporters.

But general principles are resorted to in support of
the definitive effect of admiralty sentences, and do-
mestic judgments are adduced for illustration.

In the principles of sovereignty, in the superior in-
tegrity and responsibility of domestic judges, their
exemption from the influence of policy, from the do-
minion of passions hostile to the administration of
justice, too often excited in belligerent nations, in the
prevalence of the salutary maxim of municipal ori-
gin, " *ut sit finis litium*" will be found reasons, I ap-
prehend, for superior confidence in domestic tribu-
nals.

The case of *Walker* v. *Witter*, *Doug. 5*, is
strong to show the difference between domestic and
foreign judgments ; the incontroulable verity predi-
cated of the former, is withheld from the latter, which
are there holden to be *examinable*.   Nor is the effect

of this authority repelled by the argument, that a court resorted to, to carry into effect a foreign judgment, ought to be satisfied of its justice ; the application is for *justice* and not *favour*, and the court thus resorted to is bound by constitutional principles, not to delay that justice ; besides, the same principle will apply to the case before the court.

The case of *Gage* v. *Bulkley*, in *Ridgway*, and *Burrows* v. *Jemimo*, in *Strange*, are not considered as bearing on the question ; they resting on a different principle, that of the " *Lex loci contractus.*" The qualified manner in which admiralty sentences are now received in *England;* their different operation as to the *fact* and the *law*, serve to mark a wide distinction between those sentences and domestic judgments.

If the reasons assigned for an admiralty decision, do not, when tested by the law of nations, bear out the conclusion, the sentence is rejected ; if the reasons are assigned in an obscure and unintelligible manner as to the *point decided*, the result is the same ; but if the judge should have no reasons, or, by casualty, omit to put them on the record, then the sentence becomes conclusive, and repels all examination.

Why a sentence founded on *error, as to facts*, should be more conclusive than one founded on *error in law*, is difficult to conceive. That the mode of admiralty trial, is more favourable to the investigation of truth, than that provided by our common law, is not, I apprehend, evinced by experience, nor do the opinions of some very eminent writers, warrant any such conclusion.

To sentences standing on such grounds, my mind is not yet reconciled to yield that controuling effect, now contended for. Nothing short of the law being made out in the clearest and most satisfactory manner, can, in my apprehension, justify the reception of those sentences, upon the broad ground, now urged upon the court.

There is another ground, remaining to be considered, on which it is with some difficulty I have been able to form an opinion.

The position of the insurer is, *that the assured, on entering into the policy, well knows the tribunal of the captors to be the prize-forum ;* that a consideration of neutrality is essential to the determination ; and, therefore, by the terms of his contract, assents to this test of his warranty. If the law, giving a conclusive effect to admiralty sentences, is to be deemed settled, then would the above conclusion correctly follow ; then would the assured be presumed to know *that law,* and to assent by his contract to all its consequences : but, upon any other ground, he may with equal reason be presumed to assent to a limited operation of these sentences as *prima facie,* or presumptive evidence, reserving to himself a right, and taking upon himself the burthen of disproving the same, and verifying his warranty. Such must be the conclusion of the assured in *France.*

A mind conscious of the truth of the representation in the policy, would with difficulty be carried to the conclusion, that although the property insured be, in fact, neutral, yet if condemned it must from thence be deemed enemy's. Where the property, in fact, is neutral, and in such case only, will the above opi-

ALBANY.

Vandenheuvel
v.
United Insur.
Company.

nion operate, it is not to be presumed, that the assur-
ed calculates on the event of a condemnation.  In the
various cases of loss by any of the perils insured
against, the falsification of the warranty, is equally
fatal to a recovery by the assured, though no foreign
admiralty may have passed upon the question.

Such are the grounds on which my opinion on this
important question, is formed.  I will only add, that
it is with no small diffidence, I submit an opinion for
the reversal of the judgment of a court, possessing,
in so eminent degree, the high respect and confidence
of the community.

Judgment of reversal.